143 F.3d 246
 Everett HADIX, et al. (96-2567/2568); Mary Glover, et al.
(96-2586/2588; 97-1218/1272),
Plaintiffs-Appellees/Cross-Appellants,
v.
Perry M. JOHNSON, Director, et al.,
Defendants-Appellants/Cross-Appellees.
 Nos. 96-2567, 96-2568, 96-2586, 96-2588, 97-1218 and 97-1272.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 11, 1997.
Decided April 17, 1998.
 
 Leo H. Friedman (argued and briefed), Office of the Attorney General, Corrections Division, Lansing, MI, for Appellants.
 Deborah A. LaBelle (argued and briefed), Law Offices of Deborah LaBelle, Jeffrey D. Dillman (argued), Ann Arbor, MI, Michael Barnhart (briefed), Detroit, MI, for Appellees.
 Before: KENNEDY, JONES, and SUHRHEINRICH, Circuit Judges.
 KENNEDY, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. JONES, J. (p. 259), delivered a separate concurring opinion.
 KENNEDY, Circuit Judge.
 
 
 1
 These four appeals primarily concern attorney fees in the Michigan prison reform litigation which has been the subject of numerous appeals to our Court for decision. We have consolidated the appeals for decision. One of these appeals, No. 97-1218, is moot because the order challenged in that case has expired by its terms. The three other appeals present overlapping issues surrounding the propriety of three awards of attorney fees for work performed primarily during the period of January 1, 1996 through June 30, 1996.
 
 
 2
 The major issue before us is whether the attorney fee limitation of section 803(d) of the Prison Litigation Reform Act ("PLRA" or the "Act"), 42 U.S.C. § 1997e(d) applies to work performed after the PLRA's enactment date of April 26, 1996 in a case filed before the enactment date. Section 803(d), among other things, places a cap on the hourly rate attorneys may be awarded under 42 U.S.C. § 1988 in civil rights litigation brought by prisoners. 42 U.S.C. § 1997e(d)(3). Recently, in a separate Glover appeal, we held that section 1997e(d) does not apply to work performed prior to the PLRA's enactment. Glover v. Johnson, 138 F.3d 229 (6th Cir.1998). For reasons fully explained below, we conclude that section 1997e(d) is likewise inapplicable to post-enactment work. Neither the language of the statute nor the legislative history permits us to conclude that Congress intended to differentiate between pre-enactment and post-enactment services.
 
 
 3
 In Glover, defendants also argue for reversal of the fee awards because plaintiffs were not prevailing parties within the meaning of 42 U.S.C. § 1988 in three appellate matters. As explained below, we uphold the awards as to two of the three matters and reverse as to the third because the work was not compensable compliance monitoring and plaintiffs did not prevail on appeal or on their petition for certiorari. On cross-appeal, the Glover plaintiffs argue that the District Court abused its discretion in declining to increase the hourly rate of a paralegal from the rate last approved by the court. We shall reject this contention as without merit.
 
 I. OVERVIEW OF THE LITIGATION
 A. Glover v. Johnson
 
 4
 In 1977, a now-certified class of female inmates incarcerated in the Michigan prison system, filed an action pursuant to 42 U.S.C. § 1983 in which they alleged violations of certain constitutional rights surrounding the conditions of their confinement. The District Court found that the Glover plaintiffs had been denied the same vocational and educational opportunities provided to male inmates, in violation of the Equal Protection Clause of the Fourteenth Amendment, and that the female inmates had been unconstitutionally denied meaningful access to the courts. Glover v. Johnson, 478 F.Supp. 1075 (E.D.Mich.1979) ("Glover I "). After extensive negotiations, the District Court entered an order specifying remedial actions to be undertaken by the defendants to remedy the constitutional violations found and retained jurisdiction until substantial compliance with the remedial order is achieved. Glover v. Johnson, 510 F.Supp. 1019 (E.D.Mich.1981) ("Glover II "). Neither of these orders were appealed by defendants.
 
 
 5
 On November 12, 1985, the parties stipulated to an order of the District Court, which awarded plaintiffs attorney fees, including fees for monitoring defendants' compliance with the District Court's orders, and established a system providing for plaintiffs' submission of fees and costs on a semi-annual basis and for the lodging of defendants' objections thereto. This 1985 Order, which plaintiffs contend establishes their entitlement to monitoring fees, has never been appealed. It provides in relevant part:
 
 
 6
 IT IS HEREBY ORDERED that Plaintiffs are entitled to attorney fees and that requests for such fees shall be submitted to opposing counsel every six months. Defendants will have twenty-eight days in which to contest the amount of the fee request.
 
 
 7
 Thus, since 1985, the parties have followed this procedure and plaintiffs' attorneys have been paid attorney fees at the prevailing market rate, which has increased over the years, to the current rate of $150.00 per hour. In a Memorandum Opinion and Order dated November 27, 1989 (the "1989 Order"), the District Court interpreted its 1985 Order as authorizing attorney fees for monitoring compliance with the court's orders in this case in addition to non-monitoring legal work, and as having decided the prevailing party issue. It also held that the prevailing party issue will not be re-decided with each petition for fees, and that the court is therefore not required to await the completion of an appeal before determining whether plaintiffs are prevailing parties on otherwise compensable work. Defendants appealed the 1989 Order, and this Court affirmed the District Court's holdings. Glover v. Johnson, 934 F.2d 703 (6th Cir.1991) ("Glover III ").
 
 B. Hadix v. Johnson
 
 8
 In 1980, a class of male prisoners incarcerated in the State Prison of Southern Michigan, Central Complex ("SPSM-CC"), brought a class action pursuant to 42 U.S.C. § 1983 alleging violations of their rights under the First, Eighth, Ninth and Fourteenth Amendments to the Constitution. The parties entered into a comprehensive consent decree, which was approved by and made an order of the District Court on April 4, 1985. The detailed 33-page consent decree addresses sanitation, health care, fire safety, overcrowding, volunteers, access to courts, food service, management, operations and mail at SPSM-CC and called for the submission of more detailed remedial plans to carry out a number of the consent decree mandates. Overall, the consent decree was intended to "assure the constitutionality" of the conditions of confinement at SPSM-CC. The Court retained jurisdiction to enforce the terms of the consent decree until compliance is achieved. Plaintiffs' attorneys have responsibility for monitoring defendants' compliance with the decree, which continues to this day.
 
 
 9
 On November 19, 1987, the District Court entered an order awarding fees and costs to plaintiffs' attorneys for compliance monitoring. Plaintiffs construe this order as establishing their entitlement to post-judgment monitoring fees. Under the terms of this order, defendants have the right to review and make objections to plaintiffs' fee requests. In the absence of agreement, the District Court will resolve the fee dispute.
 
 II. PROCEEDINGS BELOW
 
 10
 In Glover and Hadix, each class of plaintiffs filed a fee petition for work performed from January 1, 1996 through June 30, 1996 pursuant to established procedure. Appeal Nos. 96-2586/2588 and 96-2567/2568. The Glover plaintiffs filed a second fee petition that covered all outstanding fees and costs related to work on two appeals. Appeal No. 97-1272. Defendants objected on several grounds to all three petitions. The District Court rejected all but one of the objections in three separate orders.
 
 
 11
 Defendants argued that the attorney fee limitation of the PLRA should be applied to the fee petitions in appeal nos. 96-2586/2588 and 96-2567/2568. In nearly identical opinions, the District Court held the fee provision inapplicable to fees earned before enactment of the PLRA but applied it to those earned thereafter.
 
 
 12
 Defendants also objected to fees for work on all appellate matters in the Glover fee petitions in appeal nos. 96-2586/2588 and 97-1272, which included work on three appeals, because plaintiffs had not prevailed in these matters. The first involves Case No. 94-1617, a 1996 appeal regarding defendants' obligation to provide legal assistance to plaintiffs for parental rights matters. This case has been decided against plaintiffs and the Supreme Court has denied their petition for certiorari. Glover v. Johnson, 75 F.3d 264 (6th Cir.) ("Glover IV "), cert. denied, --- U.S. ----, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996) (hereinafter referred to as the "parental rights appeal" ). The second involves appeal nos. 95-1903/95-2037/95-2120/96-1155, consolidated appeals regarding a Compliance Committee established by the District Court (hereinafter referred to as the "Compliance Committee appeals"). These appeals were voluntarily dismissed by stipulation of the parties in March, 1996 upon dissolution of the Committee by the District Court. The third involves appeal no. 95-1521, an appeal regarding the District Court's denial of defendants' motion to terminate the District Court's supervisory jurisdiction because substantial compliance with the Remedial Plan had been achieved (hereinafter referred to as the "termination appeal"). We recently vacated this judgment, retained jurisdiction and remanded the matter to the District Court for a new determination of whether a disparity now exists between female and male inmates in educational and vocational opportunities in violation of the Equal Protection Clause of the Fourteenth Amendment and whether female inmates are presently being denied access to the courts in violation of the First Amendment. Glover v. Johnson, 138 F.3d 229 (6th Cir.1998) ("Glover V ").
 
 
 13
 In rejecting this challenge, the District Court concluded that plaintiffs were deemed prevailing parties in the 1985 Order, that plaintiffs are not required to establish prevailing party status each time fees are sought but instead need only establish that the legal work was reasonably related to ensuring compliance with the District Court's orders. The District Court went on to conclude that the legal work at issue in all three appeals was related to monitoring compliance with the Remedial Plan and consequent court orders.
 
 
 14
 The District Court also rejected defendants' objection that the award in No. 96-2586/2588 was otherwise unreasonable as conclusory and unsubstantiated. Finally, the District Court declined to increase the rate of payment for a paralegal to the prevailing market rate because she had been approved at an established lower rate. Defendants and plaintiffs filed timely notices of appeal and cross-appeal.[1]
 
 
 15
 III. THE APPLICABILITY OF THE PLRA TO THESE ACTIONS
 
 A. Statutory Background
 
 16
 The Prison Litigation Reform Act, Pub.L. No. 104-134, 110 Stat. 1321-66 (1996), was signed into law by President Clinton on April 26, 1996.[2] The PLRA, which comprises 10 sections, significantly affects prison litigation by amending several provisions of the United States Code.[3] The Act was intended to curtail what was perceived to be the over involvement of federal courts in managing state prison systems pursuant to remedial orders and consent decrees such as those involved in Glover and Hadix.[4] The second purpose of the Act was to stem the tide of frivolous prisoner suits.[5] Today we focus on section 802, which serves the first purpose identified above by limiting judicial remedies in prison condition litigation, and section 803, which serves the second statutory purpose enumerated above by amending the Civil Rights Of Institutionalized Persons Act, 42 U.S.C. § 1997, et seq. ("CRIPA").
 
 
 17
 Section 803(d) of the PLRA includes the provision governing the award of attorney fees in prisoner civil rights litigation. 42 U.S.C. § 1997e(d). It provides in relevant part:
 
 
 18
 § 1997e. Suits by prisoners
 
 
 19
 * * * * * *
 
 
 20
 (d) Attorney's fees
 
 
 21
 (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 2 of the Revised Statutes of the United States (42 U.S.C.1988), such fees shall not be awarded, except to the extent that--
 
 
 22
 (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 2 of the Revised Statutes; and
 
 
 23
 (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or
 
 
 24
 (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.
 
 
 25
 * * * * * *
 
 
 26
 (3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of title 18, United States Code, for payment of court-appointed counsel.
 
 
 27
 42 U.S.C. § 1997e(d)(1), (3). In the Eastern District of Michigan, $75 per hour is the maximum amount a court-appointed attorney may be reimbursed pursuant to 18 U.S.C. § 3006A(d)(1). The established rate of pay for plaintiffs' attorneys in both cases has been $150 per hour since at least 1993. Capping attorney fees at $112.50 (which represents 150% of the $75 maximum) would reduce plaintiffs' attorneys' hourly rate by 25%. Whether or not we apply the fee provision to the attorney fee petitions at issue in these pending cases turns on matters of statutory construction and congressional intent.
 
 
 28
 B. Judicial Construction Of PLRA Section 803(d)
 
 
 29
 1. Landgraf v. USI Film Products, Inc.
 
 
 30
 The analytical framework to be used when determining whether to apply a newly-enacted law to pending cases, or whether such application is impermissible because it would have retroactive effect is set forth by the Supreme Court in Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In step one of the Landgraf analysis, a court determines whether Congress clearly defined the temporal reach of a new law. Id. at 257-63, 280, 114 S.Ct. at 1492-96, 1505. Where Congressional intent is clear, it is controlling. Id. at 264, 114 S.Ct. at 1496. If Congressional intent is ambiguous, a court must proceed with step two, an analysis of retroactivity.
 
 
 31
 The long-standing presumption against retroactive legislation does not arise every time a statute is applied to a pending case or when its application would upset settled expectations. Id. at 269, 114 S.Ct. at 1499 Rather, a statute operates retroactively when it "attaches new legal consequences to events completed before enactment" or "impair[s] rights a party possessed when he acted." Id. at 269, 280, 114 S.Ct. at 1499, 1505. The determination of retroactivity is made after assessing "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." Id. at 270, 114 S.Ct. at 1499. Judicial inquiries should be guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations." Id. Retroactive legislation will not be applied in absence of manifestly clear Congressional intent. Id. at 280, 114 S.Ct. at 1505.
 
 2. Glover V
 
 32
 In Glover V, supra, we analyzed the attorney fee limitation under Landgraf in the context of a petition for fees for work completed before enactment of the PLRA but awarded after enactment. Under step one, we held that Congress had not explicitly prescribed the temporal reach of the provision. 138 F.3d at 249-250. In so doing, we rejected the Fourth Circuit's view that the plain language of the statute providing that fees "shall not be awarded" except as provided, evinces clear congressional intent that all post-enactment fee awards, including those compensating for pre-enactment work, must comply with section 803(d). Id. at 250 (declining to follow Alexander v. Boyd, 113 F.3d 1373 (4th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 880, 139 L.Ed.2d 869 (1998)). Under step two of Landgraf, we held that application of section 803(d) to a pending fee motion which sought compensation for work completed prior to enactment would be impermissibly retroactive because it would "attach[ ] significant new legal burdens to the completed work ... [and impair] rights acquired under pre-existing law." Id. at 250. We thus concluded that Congress did not intend the statute to be applied retroactively. We expressly limited our holding to work completed prior to enactment. Id. at 250. Now that we are squarely presented with the issue of post-enactment work in a pending case, we believe that our earlier conclusion regarding retroactivity controls the application of the very same statutory language to post-enactment fees.
 
 
 33
 Under Landgraf, the Court is to determine the temporal reach Congress intends a new statute to have in the absence of clear congressional intent. In Glover, we determined that the attorney fee provision of section 803(d), as applied to a fee petition for pre-enactment work, would be impermissibly retroactive. From this conclusion, it followed that the historic presumption against retroactive legislation arose to bar retroactive application of the statute. The presumption is invoked to interpret new statutory language overall, and we do not believe that the resulting statutory interpretation can be limited to specific circumstances. That certain applications of the statute might be permissible does not alter the statutory construction unless it can be said that Congress possessed different intentions with respect to different applications.
 
 
 34
 In this case, a court would have to find that Congress relied upon the same statutory language to convey an intent that the temporal reach of the statute is dependent upon the timing of the work, i.e., that it intended the fee provision to apply in pending cases for post-enactment fees but did not intend the provision to apply in pending cases for pre-enactment fees. We do not believe the statutory language is capable of such a sophisticated construction; either the fee provision applies in pending cases or not. Our interpretation of section 1997e(d) in Glover V. controls our interpretation of that section here. We therefore hold that the fee limitation is inapplicable to the fee petitions before us, which include work performed both prior to and after the enactment date.
 
 
 35
 While the Glover court did not rely upon the recent decision in Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), that decision supports our conclusion regarding retroactivity. As in Lindh, we have the negative inference that section 803(d) is inapplicable to pending cases arising from the fact that Congress made section 802 expressly applicable to pending cases but did not do the same with section 803. We believe that under Lindh, the artificial distinction between pre-enactment and post-enactment work breaks down. In addition, in Wright v. Morris, 111 F.3d 414, 418 (6th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997), we held that the plain language of the exhaustion requirement of section 803(d), 42 U.S.C. § 1997e(a), evinced Congress' intent that it not be applied to pending cases. Thus, Wright provides additional support for concluding that Congress did not intend to apply the fee provision to pending cases because the attorney fee provision, also part of section 803(d), contains very similar temporal language to that of the exhaustion requirement.
 
 3. Lindh v. Murphy
 
 36
 In Lindh, the Supreme Court was presented with the question of whether a provision of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), which amended the federal habeas statute, applied to an application for habeas corpus pending at the time the new statute was enacted. The Court held that because one section of the AEDPA explicitly applied to pending cases and the other relevant section did not, this evinced clear congressional intent that the latter would not apply to pending cases. Lindh v. Murphy, supra, 521 U.S. at ----, 117 S.Ct. at 2063. The majority opinion appears to say that when general rules of statutory construction are employed to determine a new statute's temporal reach--the first step of the Landgraf analysis--and a court determines that Congress intended purely prospective application, i.e., no application to pending cases, then the court need not apply the judicial default rules employed in the second step of the Landgraf analysis because there is no risk of retroactive effect. Id. at ---- - ----, 117 S.Ct. at 2062-63 ("Although Landgraf's default rules would deny application when a retroactive effect would otherwise result, other construction rules may apply to remove even the possibility of retroactivity....").
 
 
 37
 In its approach, "[t]he Court relies on one canon of statutory interpretation, expressio unius est esclusio alterius, to the exclusion of all others." Id. at ----, 117 S.Ct. at 2068 (Rehnquist, J., dissenting). "The Court's opinion rests almost entirely on the negative inference that can be drawn from the fact that Congress expressly made Chapter 154, pertaining to capital cases, applicable to pending cases, but did not make the same express provision in regards to Chapter 153." Id. "Chapter 153" refers to sections 2242 and 2253-2255 of Chapter 153 of Title 28 of the United States Code, which are amended by sections 101-106 of the AEDPA. "Chapter 154" was created by section 107 of the AEDPA and refers to new sections 2261-2266 of Title 28. Congress chose to make Chapter 154 explicitly applicable to pending cases. See Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104-132, § 107(c), 110 Stat. 1214, 1226 (1996) ("EFFECTIVE DATE.--Chapter 154 of title 28 ... shall apply to cases pending on or after the date of enactment of this Act.") Congress did not say anything about the effective date of Chapter 153. The Court read section 107(c), which made Chapter 154 explicitly applicable to pending cases, as "indicating implicitly that the amendments to chapter 153 were assumed and meant to apply to the general run of habeas cases only when those cases had been filed after the date of the Act." Lindh v. Murphy, supra, 521 U.S. at ----, 117 S.Ct. at 2063.
 
 
 38
 The Court distinguished procedural amendments, which it recognized would most likely be applied to pending cases. Id. (citing Landgraf, 511 U.S. at 275, 114 S.Ct. at 1502)[6]. The Court also suggested that had the legislative history of the two chapters been different, it might have reached a different result. Id. at ----, 117 S.Ct. at 2064. Though the two chapters began in separate bills in separate houses, they were brought together in the same bill before section 107(c) was added. "The insertion of § 107(c) with its different treatments of the two chapters thus illustrates the familiar rule that negative implications raised by disparate provisions are strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted." Id. at ----, 117 S.Ct. at 2065 (citing Field v. Mans, 516 U.S. 59, 75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995) ("The more apparently deliberate the contrast, the stronger the inference, as applied, for example to contrasting statutory sections originally enacted simultaneously in relevant respects.")).
 
 4. Legislative History of the PLRA
 
 39
 Section 802 of the PLRA contains a provision similar to that found in chapter 154 of the AEDPA making the section applicable to pending cases.[7] On the other hand, section 803 of the PLRA does not contain an effective date, just like chapter 153 of the AEDPA. The legislative history of sections 802 and 803 of the PLRA is slightly different than that of Chapters 153 and 154 of the AEDPA. The PLRA represents the culmination of efforts to reform two areas of prison litigation. First, the reformers desired to deter federal courts from so closely managing state prison systems in the context of supervising compliance with judicial decrees mandating remedies for unconstitutional prison conditions in litigation that has, in states such as Michigan, spanned decades. Second, the reformers sought to deter the "torrent" of frivolous civil rights lawsuits filed by prisoners.
 
 
 40
 Congress first proposed reform legislation in Titles II and III of the Violent Criminal Incarceration Act of 1995. H.R. 667, 104th Cong. (1995). Title II--entitled Stop Turning Out Prisoners or STOP--addressed the "judicial remedies" concern. "The purpose of the STOP Act is to keep our Federal courts from taking over State prisons." 141 Cong. Rec. S2648-02, S2649 (daily ed. Feb. 14, 1995) (statement of Sen. Hutchison)[8]. The STOP Act is the forerunner to section 802; both limit judicial remedies in prison condition litigation by amending 18 U.S.C. § 3626. Since, like section 802, the STOP Act was directed at ongoing litigation, it was made expressly applicable to pending cases. Significantly, the STOP Act included a limitation on attorney fees, which like the rest of the STOP provisions, was applicable to pending cases. Title III of H.R. 667 amended CRIPA and addressed the "frivolous lawsuit" concern. Title III is the forerunner to PLRA section 803; both intend to deter frivolous prisoner suits by amending CRIPA. Title III's CRIPA amendments were not given an effective date and, significantly, did not contain a limitation on attorney fees.
 
 
 41
 As it made its way through the legislative process, the provision limiting attorney fees was moved from the STOP Act to the CRIPA amendments in a bill introduced by Senator Abraham of Michigan. S. 1275, 104th Cong. (1995). S. 1275 continued to expressly apply the STOP Act to pending cases and to refrain from providing an effective date for the CRIPA amendments. Thus, the attorney fee limitation was moved from a section of the statute that was expressly applicable to pending cases to a section that did not contain an effective date. None of the measures in the CRIPA amendments directed at stemming frivolous lawsuits included an effective date. See S. 1275, 104th Cong. §§ 3-4 (1995). S. 1275 contains no reference to H.R. 667 nor any explanation of why the attorney fee limitation was moved from the STOP Act to the CRIPA amendments.
 
 
 42
 Additional and extensive CRIPA amendments were proposed in S. 866, a bill focused exclusively on stemming frivolous lawsuits. S. 866, 104th Cong. (1996). The provisions of S. 866 went on to become sections 803, 804, 805, 806 and 809 of the PLRA. S. 866 did not contain the STOP Act or any limitation on attorney fees. The sponsors of S. 866 subsequently introduced S. 1279, which incorporated the STOP Act of S. 1275 and the CRIPA amendments of S. 866. The STOP Act was made expressly applicable to pending cases and the CRIPA amendments were not. S. 1279 placed the attorney fee limitation in the CRIPA amendments, which is where it would remain through passage of the PLRA.
 
 
 43
 In the instant case then, "the language raising the implication" was not inserted after the STOP and CRIPA amendments had been joined in one bill as was the case in Lindh. Lindh v. Murphy, supra, 521 U.S. at ----, 117 S.Ct. at 2065. We believe that any negative inference drawn from Congress' decision to move the attorney fee provision from STOP to CRIPA is weaker than the inference drawn in Lindh. Nonetheless, the identical negative inference that was drawn in Lindh can be drawn when sections 802 and 803 are compared. Furthermore, nothing in the PLRA's legislative history suggests that Congress intended section 803 to apply to pending cases. In fact, we believe that the legislative history suggests otherwise. As discussed above, the STOP Act arose to address the perceived excesses of the federal judiciary in pending litigation such as the instant cases and was logically made expressly applicable to pending cases. In contrast, the CRIPA amendments are forward looking as they are aimed at curtailing the filing of frivolous lawsuits. We have found nothing to suggest that the CRIPA amendments were aimed at pending litigation. This interpretation is also consistent with Wright v. Morris, supra, which held the exhaustion requirement of section 803(d) inapplicable to pending cases.
 
 5. Wright v. Morris
 
 44
 PLRA section 803(d) governs the bringing of civil rights lawsuits by prisoners. Entitled "Suits by Prisoners", the section comprehensively amends section 7 of CRIPA, 42 U.S.C. § 1997e, which was formerly entitled "Exhaustion of Remedies." In addition to the attorney fee limitation, section 803(d) requires the exhaustion of administrative remedies before a prisoner may bring an action under section 1983. 42 U.S.C. § 1997e(a).[9] In Wright v. Morris, supra, this Court recently held that the plain language of the statute provides that this exhaustion requirement does not apply to pending cases.
 
 
 45
 § 1997e. Suits by prisoners
 
 
 46
 (a) Applicability of administrative remedies
 
 
 47
 "No action shall be brought with respect to prison conditions under ... [42 U.S.C. § 1983] by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).
 
 
 48
 42 U.S.C. § 1997e(a) (emphasis supplied). Issued prior to Lindh, we declined to conclude that section 803 of the PLRA was inapplicable to pending cases based solely on the negative inference drawn from the fact that section 802 is expressly applicable to pending cases. Wright, 111 F.3d at 418. Instead, we relied upon the statutory text alone: "[T]he text of the new requirement plainly states that 'no action shall be brought' without exhaustion of administrative remedies." Id. We reasoned further:
 
 
 49
 Thus, it is likely that had Congress intended the new requirement to pertain to pending cases it would have employed the same language as it used in § 802(b)(1) to make that intent clear. This strengthens our conclusion that the text of the PLRA indicates that the new administrative exhaustion requirement applies only to cases filed after the Act's passage.
 
 
 50
 Id. Even though we declined to rely solely upon the negative inference, we found the fact that section 802 contains a provision expressly applying it to pending cases to be significant.
 
 
 51
 Our interpretation of section 1997e(a) and reliance upon the negative inference that arises when section 803 is read together with section 802 is equally applicable when analyzing the attorney fee limitation. Section 1997e(d) admonishes that "fees shall not be awarded" in any way inconsistent with the rest of the subsection. This language is not meaningfully distinguishable from the temporal language of section 1997e(a), emphasized above, which provides that no action "shall be brought" prior to exhausting remedies and which we've interpreted as applying prospectively only.
 
 C. Conclusion
 
 52
 In sum, our interpretation of section 803(d), 42 U.S.C. § 1997e(d), under Landgraf in Glover V controls our interpretation of that same section here. Because application of the attorney fee provision would have an impermissible retroactive effect in a pending case involving a petition of attorney fees for pre-enactment work, section 803(d) cannot be applied to pending cases regardless of when the underlying legal work is performed. Further, the fact that Congress chose to move the attorney fee provision from a section of the PLRA made expressly applicable to pending cases to a section without an effective date raises a negative inference under Lindh that Congress intended that the fee provision apply only to cases filed after enactment of the PLRA. Finally, under Wright, the plain language of section 803(d), 42 U.S.C. § 1997e(d), is prospective. For all of these reasons, we hold that the attorney fee provision of the PLRA is inapplicable to cases brought before the statute was enacted whether the underlying work was performed before or after the enactment date of the statute.
 
 
 53
 IV. THE PREVAILING PARTY STANDARD IN POST-JUDGMENT INSTITUTIONAL REFORM LITIGATION
 
 
 54
 We next turn to whether plaintiffs are prevailing parties in these various appeals.
 
 A. The Law In The Sixth Circuit
 1. Glover v. Johnson (Glover III )
 
 55
 In Glover III, this Court rejected the same "prevailing party" argument that is advanced by defendants here. We held that "plaintiffs may rely on the trial court's 1985 order to establish that they are prevailing parties and, pursuant to that order, plaintiffs have succeeded on a significant issue." Glover III, supra, 934 F.2d at 716. We also held that moving for contempt to compel compliance with earlier District Court orders is a compensable post-judgment monitoring activity. Id. at 715-16. (citing Northcross v. Board of Education of Memphis City Schools, 611 F.2d 624, 637 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980)). In so holding, we rejected defendants' argument that prevailing party status was dependent upon the outcome of their appeal of the District Court's contempt findings. Id. We also upheld the award despite reversing the District Court in part because it interpreted its remedial order beyond the order's express terms in two areas. Id. at 712 (vocational training), 713 (work pass program). Thus, when plaintiffs seek fees for compliance monitoring, plaintiffs are not required to again establish prevailing party status, nor is the award dependent upon the outcome of an appeal.
 
 
 56
 2. Northcross v. Board of Education of Memphis City Schools
 
 
 57
 Defendants rely heavily, if not exclusively, on our statement in Northcross in their argument that plaintiffs are not entitled to fees unless they prevail on each post-judgment dispute. There we stated, "[t]he [1977] hearings [which involved plaintiffs' work defending a desegration plan from attack] were collateral to and distinct from the desegregation suit itself, which had been finally terminated in 1974, so had the plaintiffs failed to prevail on the merits the district court would have been justified in denying fees altogether." Northcross, 611 F.2d at 641. We believe that this reliance is misplaced for several reasons. First, because the Northcross plaintiffs prevailed in defending the remedy and because the Court held that plaintiffs are prevailing parties, this statement is dicta. Second, defending a remedy from collateral attack is indistinguishable from affirmatively moving for contempt to enforce compliance with the remedy because both activities share the same purpose of protecting court-ordered relief. See Jenkins v. State of Missouri, 127 F.3d 709, 717 (8th Cir.1997) (compliance monitoring, enforcement of the remedy, and defense of the remedy are generally viewed as "necessary adjuncts to the initial litigation" and compensable). Finally, the Northcross dicta relied upon by defendants is inconsistent with Glover III, which held that compliance monitoring is compensable regardless of the degree of success or the outcome of appeals.
 
 
 58
 Glover III does not however definitively answer how courts should handle the prevailing party issue when unsuccessful legal work for which fees are requested does not relate to compliance monitoring or otherwise protecting a remedy previously affirmed or not appealed. In such cases, we elect to follow the approach outlined recently by the Eight Circuit.
 
 
 59
 In an ongoing school desegregation case involving the Kansas City School District, the Eighth Circuit had occasion to examine the prevailing party issue when the Supreme Court struck down the use of certain remedial measures employed in the court-approved desegregation plan. Jenkins v. State of Missouri, supra. Because the Supreme Court's decision did not affect the district court's underlying holding that the State of Missouri had committed constitutional violations and was obligated to remedy those violations, the court found that the decision did not "retroactively take away the Jenkins class's status as a prevailing party." Id., 127 F.3d at 714 (discussing Balark v. City of Chicago, 81 F.3d 658, 665 (7th Cir.1996)) (holding that prospective termination of a 10-year-old consent decree pursuant to Rule 60(b)--as opposed to reversal on direct appeal--did not deprive plaintiffs of prevailing party status, which they enjoyed for 10 years). The Eighth Circuit treated the prevailing party question as a "threshold" issue and went on to examine "whether fees should be awarded for matters on which the plaintiff lost." Id. at 716.
 
 
 60
 The Jenkins court applied the paradigm of Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a case involving a civil rights plaintiff who had prevailed on some but not all issues, to the prevailing party issue surrounding post-judgment fees in institutional reform cases. Id. (citing Assoc. for Retarded Citizens v. Schafer, 83 F.3d 1008, 1010-12, (8th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 482, 136 L.Ed.2d 376 (1996)). The test asks first whether the issues in the post-judgment litigation are "inextricably intertwined with those on which the plaintiff prevailed in the underlying suit or whether they are distinct." Id. at 717. Compliance monitoring, enforcement of the remedy, and defense of the remedy are generally viewed as "necessary adjuncts to the initial litigation" and compensable. Id. Other activities, such as efforts to expand the scope of the original relief obtained, may amount to the assertion of distinct new claims that cannot rest upon the prevailing party determination in the underlying case. Id. When the issues are intertwined, plaintiffs are entitled to fees, i.e., they maintain their prevailing party status. Id. at 718. If on the other hand, the issues are distinct, plaintiffs are entitled to fees only if they prevail on the separate issue. Id. at 717 (discussing Arvinger v. Mayor and City Council of Baltimore, 31 F.3d 196, 202 (4th Cir.1994) and Schafer, supra, which denied prevailing party status on strength of underlying litigation under these circumstances). In applying this analysis to the facts before it, the Jenkins court concluded that the issues that went up to the Supreme Court were related to the issues on which the Jenkins class prevailed as the plaintiffs were placed in the position of defending the scope of the district court's remedial authority. Id. at 719.[10]
 
 
 61
 B. Application of The Glover III/Jenkins Standard
 
 1. The Compliance Committee Appeals
 
 62
 In yet another Glover appeal, appeal no. 96-1852, defendants raised the identical prevailing party issue with respect to the same Compliance Committee fees at issue here, albeit for a different time period. In our recently-issued decision, we held that plaintiffs were prevailing parties in these appeals by virtue of defendants' voluntary dismissal and that the work was otherwise compensable as post-judgment compliance monitoring. Glover V, supra, at 252. We therefore reject this portion of defendants' challenge.
 
 2. The Termination Appeal
 
 63
 The analysis of the termination appeal fee award is controlled by Glover III. Defendants do not argue that the work was unrelated to ensuring compliance with court orders or that the work was unrelated to the underlying issues on which plaintiffs prevailed. As the District Court found: "[T]he relief sought amounted to a complete termination of the Remedial Plan. Work provided by plaintiffs' counsel on this issue was critically related to monitoring compliance with the judgment."[11] Rather, defendants argue that the prevailing party issue cannot be decided without awaiting the outcome of appeal no. 95-1521. As explained above, this argument was made and rejected once before. Glover III, 934 F.2d at 715-16.
 
 
 64
 Additionally, we vacated the judgment denying the motion to terminate in appeal no. 95-1521, and, in lieu of assessing whether substantial compliance has been achieved, we retained jurisdiction and remanded the matter to the District Court for a new determination of whether a disparity now exists between female and male inmates in educational and vocational opportunities in violation of the Equal Protection clause of the Fourteenth Amendment and whether female inmates are presently being denied access to the courts in violation of the First Amendment. Glover V, supra, pp. 242-44. Given this outcome, we hold that plaintiffs have prevailed in appeal no. 95-1521. We further hold that this work qualifies as compensable post-judgment compliance monitoring because plaintiffs sought to protect the remedy ordered by the District Court for the equal protection violations and access to court violations it found so many years ago.
 
 3. The Parental Rights Appeal
 
 65
 The remaining issue concerns the fees related to the parental rights appeal and petition for certiorari. This appeal originated when plaintiffs filed a motion for injunctive relief to compel compliance with the District Court's orders regarding court access. Glover v. Johnson, 850 F.Supp. 592 (E.D.Mich.1994). Plaintiffs were prompted by defendants' notice of decision to reduce funding for Prison Legal Services ("PLS"), the agency which provides legal assistance to female inmates, and to wholly eliminate PLS' provision of legal assistance on parental rights matters. The District Court interpreted its earlier orders on court access as having ordered the indefinite continuation of defendants' contract with PLS, which since 1978 had required PLS to provide assistance in the area of parental rights, and held defendants in contempt of those earlier orders. Id. at 594. The District Court also concluded that the elimination of legal assistance in the area of parental rights would violate plaintiffs' newly-enunciated constitutional right to legal assistance in parental rights matters. Id. at 595-601.
 
 
 66
 The district court proceedings were broader than those on appeal. What is relevant for our purposes here is not what happened below, but instead the issues litigated on appeal. Appeal no. 96-1617 was limited to whether defendants were required by court order or by the Constitution to provide plaintiff inmates with legal assistance in parental rights matters. Plaintiffs lost on both issues. Glover IV, supra, 75 F.3d 264.
 
 
 67
 In reversing, we first held that the court had abused its discretion in holding defendants in contempt because we found no order requiring the funding of legal assistance in any particular area of law. In the absence of a violated order, the contempt finding could not be sustained. Id. at 267. Next, we held that defendants are not constitutionally required to provide plaintiffs legal assistance in parental rights matters. Id. at 269. The Supreme Court denied plaintiffs' petition for certiorari. --- U.S. ----, 117 S.Ct. 67, 136 L.Ed.2d 28 (1996).
 
 
 68
 In awarding fees for appellate work on this matter, the District Court acknowledged this Court's conclusion that defendants had provided legal services for parental rights matters without the support of a direct order but nevertheless concluded that the "work done by plaintiff contesting the termination of services was a post-judgment monitoring activity and is therefore compensable." We disagree with this conclusion. Given the lack of any remedial order, plaintiffs' counsel's efforts might best be characterized as a failed offensive attempt to expand the remedy. In such circumstances courts are less inclined to award fees. See, e.g., Ustrak v. Fairman, 851 F.2d 983, 990 (7th Cir.1988). Plaintiffs' attorneys' efforts do not qualify as post-judgment compliance monitoring and plaintiffs cannot rely upon their status as prevailing parties in the underlying litigation. We therefore reverse this portion of the challenged awards given plaintiffs' lack of success in appeal no. 96-1617 and in the petition for certiorari to the Supreme Court.
 
 C. Conclusion
 
 69
 Defendants' challenges to the award of fees for work on the Compliance Committee appeals and on the termination appeal are rejected because the work is compensable compliance monitoring and because plaintiffs prevailed. Defendants' challenge to the award of fees for the unsuccessful work on the parental rights appeal and petition for certiorari is sustained because this claim went beyond the underlying litigation and plaintiffs did not prevail.
 
 V. OTHER ISSUES ARISING IN GLOVER
 
 70
 A. The District Court's Denial of Defendants' Objections To The Award As Unreasonable Was Not Clearly Erroneous
 
 
 71
 Defendants objected to 47.4 hours in plaintiffs' fee petition as "frivolous" and "unnecessary"; 48.7 hours as "excessive" and "inappropriate"; and 18.9 hours as "non-Glover" related. The District Court found that "defendants' broad objections and conclusory allegations" were an insufficient basis for denying these fees.
 
 
 72
 On appeal, defendants make absolutely no effort to add specificity to their objections or to otherwise substantiate their claims. Defendants argue that plaintiffs have filed "unnecessary" and "frivolous" pleadings without identifying those pleadings for this Court or explaining why any such pleadings were unnecessary or frivolous. Defendants' argument that certain fees were "non-Glover related" is just a rehashing of their "prevailing party" argument, which we have rejected on numerous occasions. The District Court was not clearly erroneous in rejecting defendants' objections as an insufficient basis to deny fees which have been carefully documented by plaintiffs' counsel.
 
 
 73
 B. Whether the District Court Erred in Refusing to Approve An Award of Fees For Paralegals At The Prevailing Market Rate
 
 
 74
 Despite finding that $80 was well within the prevailing market rate for paralegals, the District Court refused to approve that rate because the rate established for paralegals in its 1990 order was $45 per hour. We conclude that the District Court did not abuse its discretion in so refusing. Plaintiffs could have submitted a petition for a higher rate before or while the services were being rendered if a higher rate was necessary.
 
 C. Appeal No. 97-1218
 
 75
 The last appeal, No. 97-1218, involves a challenge to the District Court's order of January 31, 1997 enjoining defendants from eliminating funding for provision of legal services to women prisoners at current levels. The order terminated by its own terms upon a decision in appeal No. 96-1931, which was pending at the time of the court's ruling. Thus, the issues raised in appeal no. 97-1218 became moot upon entry of our opinion in Glover V, supra, which decided, among others, appeal no. 96-1931.
 
 VI. CONCLUSION
 
 76
 We dismiss appeal no. 97-1218 as moot. In appeal nos. 96-2567/2568, 96-2586/2588 and 97-1272, we affirm in part, reverse in part and remand the cases to the District Court for a recalculation of the fee awards in a manner consistent with this opinion.
 
 
 77
 NATHANIEL R. JONES, Circuit Judge, concurring.
 
 
 78
 I generally concur in the majority's well drafted opinion. However, I write separately to express my disagreement with the majority's reversal of the district court's award of attorney's fees for work in the parental rights appeal, No. 96-1617, and the subsequent petition for certiorari to the Supreme Court. Although the plaintiffs were not ultimately successful in the appeal, I feel that this work, along with all of the other work plaintiffs' counsel performed in this case, was compensable post-judgment compliance monitoring and related to the underlying equal protection and access to court claims upon which plaintiffs prevailed in their original action. I would therefore affirm all of the fee awards in this case.
 
 
 
 [1]
 Plaintiffs filed a motion for reconsideration of the constitutional challenges they made to the PLRA's fee provision in Glover, No. 96-2586/2588, which the court denied. Plaintiffs timely appealed the denial of its motion. Because we decide that the PLRA fee provision is inapplicable to this case, we need not and do not reach plaintiffs' constitutional arguments
 
 
 [2]
 The Act is found in Title VIII of the omnibus appropriations bill for fiscal year 1996 for the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
 
 
 [3]
 The Act amends the following: 18 U.S.C. § 3626 (Section 802--Appropriate Remedies For Prison Conditions); 42 U.S.C. § 1997 (Section 803--Amendments To Civil Rights Of Institutionalized Persons Act); 11 U.S.C. § 523(a) (Section 804--Proceedings In Forma Pauperis); 28 U.S.C. §§ 1915 (Section 804--Proceedings In Forma Pauperis); 28 U.S.C. § 1346(b) (Section 806--Federal Tort Claims); and 18 U.S.C. § 3624(b) (Section 809--Earned Release Credit or Good Time Credit Revocation). The Act also adds provisions, including new sections 1915A (Section 805--Judicial Screening) and 1932 (Section 809--Earned Release Credit or Good Time Credit Revocation) to title 28 of the United States Code
 
 
 [4]
 See, e.g., 141 Cong. Rec. S14316 (daily ed., Sept. 26, 1995) (statement of Sen. Abraham) ("The legislation I am introducing today [S. 1275] will return sanity and State control to our prison systems by limiting judicial remedies in prison cases [such as those in the State of Michigan]...."); 141 Cong. Rec. S14414 (daily ed., Sept. 27, 1995) (statement of Sen. Dole) ("These guidelines will work to restrain liberal federal judges who see violations on [sic] constitutional rights in every prisoner complaint who have used these complaints to micromanage state and local prisons.")
 
 
 [5]
 See, e.g., 141 Cong. Rec. S14316 (daily ed., Sept. 26, 1995) (statement of Sen. Abraham) (in addition to problems with "massive judicial interventions in state prison systems," we also have [the problem of] frivolous inmate litigation); 141 Cong. Rec. S14414 (daily ed., Sept. 27, 1995) (statement of Sen. Dole) (legislation introduced, S. 1279, will address the "alarming number of frivolous lawsuits" filed by prisoners)
 
 
 [6]
 In Landgraf, the Court considered without deciding whether attorney fee provisions are procedural or whether they affect substantive rights. Compare Landgraf, 511 U.S. at 277, 114 S.Ct. at 1503 ("[a]ttorney's fee determinations are 'collateral to the main cause of action' ") (citations omitted), with Landgraf v. USI Film Products, 511 U.S. 244, 292, 114 S.Ct. 1522, 1525, 128 L.Ed.2d 229 (1994) (Scalia, J., concurring) ("holding a person liable for attorney's fees affects a 'substantive right' "). In Glover V, we rejected the argument that attorney fee provisions can never result in retroactive effect because they may be procedural in nature or are collateral to the main cause of action. Glover V, supra, at 250. "[L]aws regulating litigation conduct [including attorney fee provisions] often impact the substantive rights of the parties as well ... [and must be scrutinized under the Supreme Court's retroactivity analysis]". Id
 
 
 [7]
 Section 802(b)(1) provides that section 802(a), which amends 18 U.S.C. § 3626, "shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title."
 
 
 [8]
 Senator Hutchison of Texas introduced S. 400 in the Senate, which was identical to Title II of H.R. 667
 
 
 [9]
 Under section 803(d), a court may sua sponte dismiss a civil rights action filed by a prisoner, 42 U.S.C. § 1997e(c); a prisoner may not bring an action for emotional injury without a showing of physical injury, id. § 1997e(e); courts are instructed to conduct hearings by phone to the extent practicable, id. § 1997e(f); and civil rights defendants may waive their right to reply to a complaint without prejudice, id. § 1997e(g)
 
 
 [10]
 The Jenkins court went on to examine the reasonableness of the fee award and reduced the fee amount by 50% to reflect plaintiffs' limited success. Id. at 718-20. We express no opinion on this portion of the decision
 
 
 [11]
 The District Court had ruled in an earlier opinion of May 30, 1996, that a decision on fees related to work on No. 95-1521 would be stayed pending the outcome of the appeal. However, the District Court must have reconsidered the issue because it granted both fee petitions involved here, which included fees for work in No. 95-1521