*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0072p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

BINTA B., by her next friend S.A.; AIDEN L. and NAKIA L., by their next friend S.L.; SARAI R. and AMBER R., by their next friend T.R.; GUNNAR U., by his next friend M.U.,
                    *Plaintiffs-Appellees*,

    *v.*

DARIN GORDON, in his official capacity as Deputy Commissioner and Director of the Bureau of TennCare; MARK EMKES, in his official capacity as Commissioner of the Tennessee Department of Finance and Administration,
                    *Defendants-Appellants*.

Nos. 10-6005/12-5532

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:79-cv-3107—John T. Nixon, District Judge.

Argued: January 25, 2013

Decided and Filed:  March 20, 2013

Before:  SILER, SUTTON, and McKEAGUE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Michael W. Kirk, COOPER & KIRK, PLLC, Washington, D.C., for Appellants in 10-6005 and 12-5532.  Christopher E. Coleman, TENNESSEE JUSTICE CENTER, Nashville, Tennessee, for Appellees in 10-6005 and 12-5532.  **ON BRIEF:** Michael W. Kirk, Charles Cooper, Derek L. Shaffer, COOPER & KIRK, PLLC, Washington, D.C., Linda A. Ross, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants in 10-6005.  Michael W. Kirk, Nicole J. Moss, Adam R.F. Gustafson, COOPER & KIRK, PLLC, Washington, D.C., Linda A. Ross, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants in 12-5532.   Christopher E. Coleman, Gordon Bonnyman, Jr., TENNESSEE JUSTICE CENTER, Nashville, Tennessee, Kenneth W. Zeller, AARP FOUNDATION LITIGATION, Washington, D.C., for Appellees in 10-6005. Christopher E. Coleman, Gordon Bonnyman, Jr., TENNESSEE JUSTICE CENTER,

Nashville, Tennessee, William H. Farmer, James W. White, JONES HAWKINS & FARMER, PLC, Nashville, Tennessee, for Appellees in 12-5532.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.   Congress and the Supreme Court have made it abundantly clear that the aim of 42 U.S.C. § 1988 "is not for the purpose of aiding lawyers.  The purpose of th[e] bill is to aid civil rights." 122 CONG. REC. 33,314 (Sept. 29, 1976) (remarks of Sen. Kennedy); *Farrar v. Hobby*, 506 U.S. 103, 115 (1992) ("awards under § 1988 were never intended to produce windfalls to attorneys . . . ."). Yet, Congress' allowance for fees under § 1988 occasionally is misunderstood and misused.  The original petition for fees in this case, for example, yielded requests for dry cleaning bills, mini blinds, and health insurance.  Though these requests were later dropped after being challenged, they exemplify the overcompensation some attorneys are apt to seek in litigation of this type—decades long class actions involving thousands of hours of work, numerous iterations of consent decrees, and years in-between spent enforcing and defending prior successes.

There are two sides to these attorney-fee debates, and we must honor both of them.  On the one hand, § 1988 plays a critical role in "ensur[ing] that federal rights are adequately enforced," and attorneys have every right to be compensated for any fees and expenses they reasonably incur. *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1671 (2010).  On the other hand, these cases can all too easily become a way of life for the attorneys involved, and consequently over time it can become increasingly unclear, for both the attorneys and the courts, precisely what work falls within the ambit of § 1988. This case presents us with an opportunity to clarify the standards for when time spent defending or enforcing a prior consent decree is compensable under § 1988.

The State here challenges the district court's determination that plaintiffs were prevailing parties under § 1988, its conclusion that several categories of work performed by plaintiffs' counsel were "reasonably expended" on the litigation, and its

20% reduction in the fee award.  For the reasons that follow, we affirm the award for work involving review of the Governor's proposal, we vacate the award for fees involving work in *John B., Ware*, and *Daniels*, and we vacate and remand the overall percentage reduction, and the award for work involving *Rosen*, the HAT injunction, opposing plaintiff-intervenors, work categorized as public relations, negotiating with legislators, negotiating with the Governor, and analyzing the soft-limits initiative.

## I.

### A.  History Leading to the Appeals in 10-6005 and 12-5532

This case has been ongoing for over thirty years.  For purposes of these consolidated appeals, the relevant facts are as follows.  In 1979, Pearl Bailey and Cluster Daniels filed a complaint under 42 U.S.C. § 1983 on behalf of present and future Medicaid recipients alleging that Tennessee's medicaid program violated the requirements of the Medicaid Act, 42 U.S.C. § 1396, *et seq.*, and the Due Process Clause of the Fourteenth Amendment.  In March of 1983, Donna Owens, Agnes Denton, Ollie Johnson, Gaynell Grier and Dorothy Cantrell were granted leave to intervene as plaintiffs.  Later that year, plaintiffs' counsel notified the court and the state that Pearl Bailey, one of the two original plaintiffs, had died.  In 1984, Nannie Breeden and Carolyn Fitts were granted leave to intervene as plaintiffs.  On January 4, 1985, the district court certified a subclass under FED. R. CIV. P. 23.  That subclass was Tennessee Medicaid recipients "who have not been notified when claims for Medicaid payments . . . have been denied, or have not been notified of the reasons for denial of payment, or have not been notified of their fair hearing rights."  App. 490.  Thus, at the time the class was certified, Daniels, Grier, Cantrell, Owens, Denton, Johnson, Breeden, and Fitts were in the class and had all been named as class representatives.

Over the course of the next several decades, the parties attempted to resolve their disputes through various consent decrees and revisions to those decrees.  The first decree was entered into in 1986, then another in 1992.  In January 1994, Tennessee converted its traditional Medicaid program to a managed care program called TennCare.  Under

TennCare, the state contracts directly with private managed care contractors to provide healthcare to TennCare recipients.  The contractors are required by contract to comply with previously mandated notice and hearing requirements.

In 1995, five class members filed motions to modify the 1992 consent decree alleging the TennCare program was being administered in a manner inconsistent with the 1992 decree and federal law.  The caption on plaintiffs' motion stated it was being brought by "Cluster Daniels, ET AL., Plaintiffs, and C.J. by his next friend, C.S.; [and three other individuals identified with initials], as representative class members . . . ." App. 192.  The State opposed the substance of the motions with several affidavits.  The captions on the State's affidavits similarly listed "C.J., by his next friend, C.S.," and others, as "representative class members."  The affidavits argued that the bulk of the "named plaintiffs'" grievances, including C.J.'s,  had been resolved, but did not expressly contest C.J.'s role as a "representative class member."  App. 617-23, 659-62.

On May 15, 1996, the district court partially granted the motions filed by C.J. and the other named representatives and ordered the State to submit proposed modifications to the 1992 consent decree that would comport with the Medicaid Act and constitutional due process requirements.  On August 26, 1996, the court entered an order approving the State's proposed modifications.  The order's caption listed "C.J. by his next friend, C.S." as a "representative class member[]."  App. 510.

In 1998, class counsel notified the district court that plaintiffs Daniels and Breeden died.  Thus, as of that date, as far as any of the parties were aware, the representative class members remaining in the litigation were Greer, Cantrell, Owens, Denton, Johnson, Fitts, and possibly C.J. and the other minors listed as representatives during the 1995-96 action.

The consent decree was again revised in 1999 and 2000.  In March 2003, the parties entered negotiations to revise the 2000 consent decree, and to discuss three other ongoing class action lawsuits involving different aspects of TennCare's administration. On October 1, 2003, the district court finally approved and entered the Revised Consent

Decree (Modified) in this case ("2003 Consent Decree"). App. 353.[1]  According to the court, the 2003 Consent Decree "contain[ed] the strongest due process protections" yet. *Grier v. Goetz*, 402 F. Supp. 2d 876, 937 (M.D. Tenn. 2005).

The 2003 Consent Decree also stated that the State would continue to "have primary responsibility for monitoring and enforcing compliance" with the consent decree and "the regulations and laws incorporated herein."  However, it also set forth several monitoring functions for plaintiffs' counsel, including document inspection for "monitoring compliance with this order," and "inspect[ing] the operation of any state agency" involved with implementation of the decree. App. 389-90.  The 2003 Consent Decree also awarded plaintiffs attorney's fees as the prevailing parties under 42 U.S.C. § 1988. App. 391.  Accordingly, in a later order, the district court awarded plaintiffs $628,123.47 in fees and expenses based on the parties' jointly agreed-upon resolution as to those fees and expenses.

A few months after entering the 2003 Consent Decree, the State announced plans to restructure TennCare in light of severe state budget problems.  The State's proposal admitted that changes in the program may require revising the consent decrees in this and the other ongoing cases.  These changes included eliminating non-Medicaid eligibility categories and disenrolling a large number of adults and children from the program should the State's requested proposal not be adopted. App. 808-09.[2]

---

[1]There were consent decrees in at least two of the other cases, including *John B. v. Goetz* (dealing with "the requirements for the Medicaid Early and Periodic Screening, Diagnosis, and Treatment program in Tennessee"), and *Rosen v. Comm'r of Fin. and Admin.* (dealing with "requirements related to due process rights for persons applying for TennCare or being disenrolled from TennCare").  The issues in *Rosen* are related to the issues here, which the State previously characterized as addressing "due process requirements related to denials, reductions, suspensions, terminations, or delays in service delivery." App. 757.  Plaintiffs' counsel in this case was also involved in *Rosen*.

[2]After the State announced its plans to reconfigure the system, the district court in *Rosen* enjoined the State against proceeding with the disenrollments.  This Court reversed that decision. *Rosen v. Goetz*, 129 F. App'x 167 (6th Cir. 2005) (per curiam).  On remand, the district court again enjoined the State from beginning the disenrollment process.  On appeal, this Court reversed again. *Rosen v. Goetz*, 410 F.3d 919 (6th Cir. 2005) (per curiam) (*Rosen II*).  As noted by this Court in *Rosen II*, the State and plaintiffs, along with two hospital associations and several hospitals, had recently entered into a Memorandum of Understanding (MOU), the terms of which would have allowed for continuing medical coverage for up to 100,000 persons.  In part, the MOU was conditioned on (1) approval of the funds by the legislature, (2)timely and favorable rulings in the *Rosen* case, and (3) modifications to the 2003 consent decree in this case. *Rosen*, 410 F.3d at 925.

Shortly after the state announced its proposal, the district court granted a motion allowing several other plaintiff-intervenors from the *Rosen* action to intervene in this case for limited purposes. The plaintiff-intervenors (all of whom were subject to disenrollment under the State's plan) ultimately *supported* the State's motion to modify the 2003 Consent Decree since granting the motion to modify would have potentially allowed 100,000 people to remain covered by TennCare.

On June 15, 2005, the State officially filed its motion to revise the 2003 Consent Decree. As summarized by the district court, the State's motion contained 34 separate requests for modification and/or clarification of the 2003 Consent Decree relating primarily to prescription drugs, benefit limits, and the TennCare appeals process. After several days of hearings on the motion, the court ultimately granted the motion in part and denied it in part. *Grier*, 402 F. Supp. 2d at 882 ("2005 Revised Consent Decree").

The district court later concluded, "Out of Defendants' thirty-four (34) requests for modification, Plaintiffs did not object to three (3) requests, and the Court granted these three (3) requests and two (2) additional requests without limitation. The vast majority of the remaining twenty-nine (29) requests were either granted with severe limitations or denied in their entirety." *Grier v. Goetz*, No. 3:79-3107, slip op. at 4 (M.D. Tenn. Aug. 13, 2009). The court also noted in its decision on the State's motion to modify that "[a]lthough the Court has granted many of Defendants' requests for modification, it has denied or limited certain requests relating to the appeals process in order to adequately protect the due process rights of TennCare enrollees. Without these protections, this Court is concerned that the rights of the plaintiff class may be severely restricted. As a result, the necessity of the underlying goal of the Decree has in no way diminished." *Grier*, 402 F. Supp. 2d at 937.[3]

In January 2006, plaintiffs' counsel moved for attorney's fees pursuant to 42 U.S.C. § 1988. The State opposed the motion but did not argue that there was no

___

[3]During all of the litigation over the 2003 Consent Decree, none of the parties noticed that in the meantime, several of the named class representatives had either died or disenrolled from TennCare. This potentially important detail was not revealed until several years later when the State filed the appeal now under review.

proper plaintiff before the court.  The district court granted plaintiffs' motion for fees and held that they were "entitled to reasonable attorney's fees and expenses for (1) partially prevailing in defending and revising the 2003 Consent Decree, and (2) successfully monitoring implementation and enforcement of the 2003 Consent Decree." *Grier v. Goetz*, 421 F. Supp. 2d 1061, 1080 (M.D. Tenn. 2006).  The court reserved judgment on what "reasonable" fees would be.

In March 2007, plaintiffs filed a detailed fee request seeking fees for work performed from November 1, 2003 (just after entry of the 2003 Consent Decree) to January 31, 2007.  The State opposed the request, but only on the basis that the fees were excessive.  It again did not argue that there was no proper named plaintiff before the court.

In August 2009, the district court issued its order awarding plaintiffs over $2.57 million in fees and expenses for litigation leading up to the 2005 Revised Consent Decree.  *Grier v. Goetz*, No. 3:79-3107, slip op. at 2 (M.D. Tenn. August 13, 2009). Plaintiffs had originally requested a lodestar amount of $3,313,458.00, but the district court reduced the award by twenty percent on account of plaintiffs' "limited" success "relative to the breadth of Defendants' requests [to modify the 2003 consent decree] and the scope of the litigation." *Id.* at 49-51.  The court noted that there was "no dispute that Plaintiffs in this case are the prevailing party, and thus entitled to attorneys' fees under 42 U.S.C. § 1988[,]" and thus "[t]he main issue before the Court is what adjustment, if any, is required given that the Plaintiffs only *partially* prevailed." *Id.* at 11.

After the district court denied the State's motion to alter or amend the award, the State timely noticed an appeal to this Court, which was docketed as No. 10-6005.

## B.  Proceedings in No. 10-6005

Soon after filing its notice of appeal to this Court, the State sent a letter to plaintiffs' counsel indicating that the Sixth Circuit's clerk's office contacted the State about who the plaintiffs-appellees were in this case.  After some investigation, the State realized that none of the six individuals previously "appointed" by the court as class

representatives remained alive or enrolled in TennCare. As indicated above, Bailey, Daniels, and Breeden had all died, and plaintiffs counsel had notified the court of those deaths in 1983 and 1998. But the State also discovered that Cantrell died in 1994, Grier died in 2003, and Fitts moved to Alabama in 2005. According to the State, that did not leave anyone as a named plaintiff.[4]

The next day, plaintiffs' counsel sent a letter to the Sixth Circuit clerk indicating that C.J. (Julian Caster), who had appeared on several pleadings as a "representative class member" in the mid-1990s, was the named representative who should appear on the docket.

Subsequently, the State filed in this Court a motion for summary vacatur of the district court's orders and a request for remand. The motion argued for the first time that "there is no named Plaintiff-Appellee before this Court who has been permitted to intervene in this action and has been certified as an adequate and appropriate class representative such that he or she might properly defend the attorneys' fee award." 09/30/10 Def's Mot. at 4. The State further argued that "unless and until a new class member seeks and is granted leave to intervene as a Plaintiff and is certified as an adequate and appropriate class representative by the district court in accordance with Rule 23(c)(4), the court below may not even consider, much less grant, the attorneys' fee motion . . ." 09/30/10 Def's Mot. at 4.

This Court denied the State's motion, explaining that the issue should first be raised in the district court under FED. R. CIV. P. 62.1 and FED. R. APP. P. 12.1 notwithstanding the pendency of the appeal. *Goetz v. C.J. by C.S.*, No. 10-6005, at 2 (6th Cir. Nov. 8, 2010) (order denying motion for summary vacatur). The order advised

---

[4]With respect to the other original named representatives, Owen, Denton, and Johnson, the State argues that while they were granted leave to intervene, "[i]t does not appear that these three were ever treated as class representatives by either the district court or Class Counsel, but in any event two of the three have died (in 1996 and 2005, respectively), and the third lost her eligibility for TennCare and thus left the class and the litigation in 1995." Appellant's Br. in 12-5532 at 3 n.2. The State's argument is not entirely accurate. After Owens, Denton, and Johnson were granted leave to intervene, they were named as class representatives on the motion to intervene filed by Nannie Breeden and Carolyn Fitts. App. 174. But because of the timing of their deaths or disenrollment, their status does not influence the outcome in this case.

that "[i]f the district court certifies that it is inclined to vacate or modify the award of fees and costs or that the state has raised a substantial issue, the state may then move this court to remand under Rule 12.1." *Id.*

Heeding these instructions, the State filed a motion in the district court requesting an indicative ruling that the court would grant inquiry into possible certification of a new class representative and vacatur of the fee award on the ground that the fee had not been awarded to a "prevailing party." On August 31, 2011, the district court issued an order stating that the motion raised substantial issues warranting further proceedings on remand. *Grier v. Goetz*, No. 3:79-cv-3107, at 5 (M.D. Tenn. Aug. 31, 2011) (order). Accordingly, the State filed a motion to remand in this Court, which was granted—remanding the case "to the district court for consideration of the defendants' motion to vacate the fee award." *C.J. by C.S. v. Gordon*, No. 10-6005, at 2 (6th Cir. Nov. 7, 2011) (order granting motion to remand).[5]

## C. District Court Proceedings on Remand and Appeal in Case No. 12-5532

On remand, plaintiffs filed a motion to add new class representatives. R. 1746. The State filed a motion to summarily vacate the fee award and for leave to take discovery into whether any newly proposed class member can adequately protect the interests of the class. R. 1757. The State argued that as a matter of law there is no such thing as "implicit" certification of a class representative and thus C.J., by and through his next friend C.S., could not be a class representative because he never properly intervened and was never certified.

The district court first took up the State's argument that there can be no implicit certification of a class representative, but ultimately did not expressly rule on this issue. Rather, it summarily held that "Defendants' efforts to have the 2009 fee award to Plaintiffs summarily vacated have fallen short. The cases to which they cite for the

---

[5]Briefing in the State's initial appeal, case No. 10-6005, continued notwithstanding the pendency of the State's motion below. Briefs in 10-6005 were filed in March, April, and May 2011, which was prior to the district court's decision on whether it would hear the issues related to class representation and the fee award.

notion that, as a matter of law, the award must be vacated do not, upon close inspection, mandate that result." *Grier v. Goetz*, 2012 WL 1393057, at \*6 (M.D. Tenn. April 23, 2012).

With respect to the State's request to conduct discovery on the role of C.J. and C.S. in the litigation, the court stated that such discovery was unwarranted because plaintiffs were not seeking to add C.J. or C.S. as class representatives, and in any event, "the issue before the Court is the validity of a fee award granted to Plaintiffs in 2009." *Id.* at \*7. In further explaining its ruling on the discovery issue, the court stated that it found merit in the assertion that the prevailing party for purposes of the fee award is the class as a whole rather than a particular class representative or attorney. *Id.* at \*8.[6]

The State timely appealed. The appeal was docketed as 12-5532. The two appeals were consolidated for argument.

## II.

"A district court's determination of prevailing-party status for awards under attorney-fee-shifting statutes—such as 42 U.S.C. § 1988—is a legal question that [this court] reviews de novo." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 619 (6th Cir. 2007). We review a district court's award of attorney fees under 42 U.S.C. § 1988 for an abuse of discretion. *Reed v. Rhodes*, 179 F.3d 453, 469 n.2 (6th Cir. 1999). A district court abuses its discretion when it "relies upon clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard." *Wikol ex rel. Wikol v. Birmingham Pub. Sch. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004).

## III.

Defendants initially argue that the fee award was improper because there was not an adequate named class representative after June 3, 2005, which was when named representative Carolyn Fitts moved to Alabama. As of that date, defendants argue, all

---

[6]The district court's order also granted Plaintiffs' motion to add class members, including Binta B. The State did not appeal that ruling.

of the named representatives had either died or left the class and the litigation.  Thus, according to defendants, without an adequate named representative, there could not have been a prevailing *party*, and the 2009 fee award was therefore improper.

One of the prerequisites for class certification under FED. R. CIV. P. 23 is that the "representative parties" can sue on behalf of the class only if they "fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  In this case, at the time the district court certified the class in 1985, several named representatives satisfied this requirement, including Carolyn Fitts.

But a district court's responsibilities with respect to Rule 23(a) do not end once the class is certified.  As we noted in *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1214 (6th Cir. 1997), even after certification, so long as a district court retains jurisdiction over the case, the court must still inquire into the adequacy of representation and withdraw class certification if adequate representation is not furnished.  *Id.* (quoting *Grigsby v. N. Miss. Med. Ctr., Inc.*, 586 F.2d 457, 462 (5th Cir. 1978)).  Generally, decertification would be precipitated by a motion by the defendants specifically challenging the named representatives' qualifications as representatives of the class. *See, e.g., In re Se. Milk Antitrust Litig.*, 2011 WL 3205798, at *1 (E.D. Tenn. July 28, 2011) (considering defendants' motion to decertify the class based on failure to meet Rule 23(a)'s requirements); *Tate v. Hartsville/Trousdale Cnty.*, 2010 WL 4822270, at *1 (M.D. Tenn. Nov. 22, 2010) (same); *Bradberry v. John Hancock Mut. Life Ins. Co.*, 222 F.R.D. 568, 570 (W.D. Tenn. Aug. 13, 2004) (same); *Thompson v. Cmty. Ins. Co.*, 2004 WL 5345144, at *1 (S.D. Ohio Sept. 20, 2004) (same).

But in this case, defendants never questioned the adequacy of the named plaintiffs until 2010—long after the district court approved the 2005 Revised Consent Decree and after entry of the 2009 fees award.  When defendants finally raised the issue, they asserted in part that Carolyn Fitts had been disenrolled from TennCare in 2005 when she moved to Alabama.  According to defendants, this meant she had withdrawn from the class and the litigation and was presumably therefore not an adequate class representative.  Appellant Br. in 10-6005 at 6.  But apart from an affidavit submitted by

defendants confirming that Fitts had moved to Alabama and been disenrolled from TennCare, there is nothing in the record supporting defendants' conclusion that Fitts withdrew from the class and the litigation or had otherwise been found by the district court to be an inadequate named representative.

Even though defendants are not asking us to dismiss this case on mootness grounds, the Supreme Court's explanation of the mootness doctrine as applied to class action plaintiffs is instructive.  In *Sosna v. Iowa*, 419 U.S. 393, 395-96 (1975), Carol Sosna challenged an Iowa law requiring individuals to reside in Iowa for one year prior to seeking a divorce.  Sosna brought the suit as the named representative of a class of similarly situated individuals. *Id.* at 399.  By the time Sosna's case reached the Supreme Court, she had long satisfied the residency requirement and also obtained a divorce; thus, as the Court acknowledged, if she had sued only on her own behalf, the case would have been moot and required dismissal. *Id.*

However, rather than dismissing the case, the Court held that "[w]hen the District Court certified the propriety of the class action, the class of unnamed persons described in the certification acquired a legal status separate from the interest asserted by [Sosna]." *Id.*  On this basis, the Court reasoned that "[a]lthough the controversy is no longer alive as to . . . Sosna, it remains very much alive for the class of persons she has been certified to represent." *Id.* at 401.  The Court further noted that this analysis shifts the focus from whether the case is justiciable to Rule 23's fair and adequate representation requirement. Addressing this requirement, the Court concluded that even though Sosna's personal claim may be moot, she still adequately protected the interests of the class because it was "unlikely that segments of the class [Sosna] represent[ed] would have interests conflicting with those she . . . sought to advance." *Id.* at 403.

While *Sosna* is first and foremost an Article III determination, we can distill from its reasoning that a named class representative may still adequately represent the class, for purposes of Rule 23, even if the representative's personal claims have become moot, at least until such time that there is a determination that the representative is no longer adequate.  Applying these principles to this case, the fact that Fitts moved to Alabama

and was disenrolled from TennCare does not inexorably lead to the conclusion that she was not an adequate class representative under Rule 23.  Because defendants never raised the issue of Fitts' adequacy below, no court ever passed on that question. Defendants have not established that Fitts was not an adequate representative at all times relevant to this appeal, thus she remained a named representative of the class when the district court approved the 2005 Revised Consent Decree and when it entered the 2009 fee award, and we reject defendants' argument that there was no prevailing *party*.

**IV.**

Having addressed defendants' argument that there was no *party* to prevail under 42 U.S.C. § 1988, we turn next to their argument that plaintiffs did not *prevail* as contemplated by that same statute.  The crux of defendants' argument is that it was the defendants, not plaintiffs, who prevailed when the district court permitted many of defendants' requested modifications to the 2003 Consent Decree and subsequently approved the 2005 Revised Consent Decree.  By contrast, the district court found that with respect to the 2005 Revised Consent Decree, while plaintiffs' victory was only partial, "[t]he vast majority of the [defendants'] . . . requests were either granted with severe limitations or denied in their entirety." *Grier v. Goetz*, No. 3:79-3107, slip op. at 4 (M.D. Tenn. August 13, 2009).  The court also noted that "[a]lthough the Court has granted many of Defendants' requests for modification, it has denied or limited certain requests relating to the appeals process in order to adequately protect the due process rights of TennCare enrollees.  Without these protections, this Court is concerned that the rights of the plaintiff class may be severely restricted.  As a result, the necessity of the underlying goal of the Decree has in no way diminished." *Grier*, 402 F. Supp. 2d at 937.

42 U.S.C. § 1988(b) permits the court, in its discretion, to allow the "prevailing party" in a federal civil rights action "a reasonable attorney's fee as part of the costs." Congress enacted the statute as an exception to the general rule in our legal system that parties are required to pay their own attorney's fees "in order to ensure that federal rights are adequately enforced." *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1671 (2010).

"Prevailing party" is a legal term of art designating "one who has been awarded some relief by the court . . . ." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 603 (2001). The Supreme Court has stated that in providing for fees under § 1988, "Congress intended to permit the . . . award of counsel fees only when a party has prevailed on the merits." *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) (per curiam).

Over time, "prevail[ing] on the merits" has been distilled to "succeed[ing] on any significant issue . . . which achieves some of the benefit the parties sought in bringing suit," *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), "the settling of some dispute which affects the behavior of the defendant towards the plaintiff," *Hewitt v. Helms*, 482 U.S. 755, 761 (1987), and resolution of the dispute in a way that materially alters the legal relationship of the parties. *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989). Importantly for purposes of this case, the Court has explained that the required material alteration of the parties' legal relationship can come by way of a settlement agreement "enforced through a consent decree . . . ." *Buckhannon*, 532 U.S. at 604 (citing *Maher v. Gagne*, 448 U.S. 122, 129 (1980)).

The Court has also concluded that "the prevailing party inquiry does not turn on the magnitude of the relief obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Thus, as we have previously noted, "A plaintiff crosses the threshold to 'prevailing party' status by succeeding on a single claim, even if he loses on several others and even if that limited success does not grant him the 'primary relief' he sought." *McQueary v. Conway*, 614 F.3d 591, 603 (6th Cir. 2010) (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 790–91).

There is no dispute here that plaintiffs were prevailing parties under the 2003 Consent Decree. In fact, that agreement actually enshrined plaintiffs' prevailing party status. *See* 2003 Consent Decree, App. 391 ("Plaintiffs are prevailing parties for purposes of their entitlement to an award of attorneys' fees under 42 U.S.C. § 1988 for legal services rendered by their counsel in connection with these proceedings."). The real question here is what impact the 2003 decree has on plaintiffs' prevailing party

status going forward, especially where plaintiffs' efforts are concentrated on defending that decree from substantial modification by defendants.  Are plaintiffs required to reestablish their prevailing party status and a material alteration of the parties' legal relationship with each new iteration of the consent decree? Or alternatively, can plaintiffs rely on their earlier prevailing party status, and only be required to show that the work they performed was otherwise compensable because it was in some way spent defending the earlier award?[7]  We look to Supreme Court and Sixth Circuit precedent for answers to these questions.

In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 549 (1986), the citizens' council filed suit under the Clean Air Act to compel the state to establish a vehicle emission inspection program as required by the Act.[8]  The parties entered into a consent decree in 1978 establishing the state's duties in implementing the program.  The state was slow to implement the plan, and over the course of the next five years, the citizens' council took various steps to defend the original decree and get the state to follow through on its agreement.

Ultimately, the citizen's council sought fees for work performed after the 1978 consent decree, in particular, for its work in monitoring compliance, commenting on the regulations, and defending the original decree at the EPA hearings. *Id.* at 550-53.

The Supreme Court upheld the fee award for these activities.  The Court explained that counsel's work after the decree was "as necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which

---

[7]There is a distinction in this case between fees for time defending the earlier consent decree and fees for time spent monitoring defendants' compliance with the earlier consent decree.  While defendants claim to be challenging both, and their opening brief generally challenges fees for monitoring work, they specifically only challenge certain categories of work spent defending or enforcing the decree, and though our review of those categories reveals that defendants may have erroneously included some monitoring hours in these categories, it is clear the thrust of defendants' argument involves work spent defending or enforcing the decree and not monitoring.  Accordingly, we focus our inquiry on the requirements for compensation for defending or enforcing a decree, not monitoring compliance with it.

[8]The Court explained that the CAA fee-shifting provision and § 1988 should be interpreted in the same manner.  478 U.S. at 560.  The CAA provision read: "The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  42 U.S.C. § 7604(d).

secured [plaintiffs'] initial success in obtaining the consent decree." *Id.* at 558. Additionally, the Court discussed the detailed nature of the consent decree and explained that:

> [p]rotection of the full scope of relief afforded by the consent decree was thus crucial to safeguard the interests asserted by [plaintiffs]; and enforcement of the decree, whether in the courtroom before a judge, or in front of a regulatory agency with power to modify the substance of the program ordered by the court, involved the type of work which is properly compensable as a cost of litigation under [the CAA]. *In a case of this kind, measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which [plaintiffs] prevailed in securing the consent decree.*

*Id.* at 558-59 (emphasis added).

Even though the Court's holding was not specifically based on prevailing party status under § 1988, we have employed similar reasoning in two § 1988 cases.

In *Glover v. Johnson*, 934 F.2d 703, 715 (6th Cir. 1991), we permitted the plaintiffs to rely on an earlier fee award as the basis for their prevailing party status going forward. There the district court entered orders in 1979 and 1981 directing the defendants to remedy equal protection violations. *Id.* at 706. In 1985, the court found defendants in contempt for not abiding by the earlier orders and awarded fees to plaintiffs as prevailing parties. *Id.* The 1985 award also stated that plaintiffs would be entitled to post-judgment fees for work to enforce the earlier awards. *Id.* at 715. In 1989, the plaintiffs were partially successful after filing a contempt motion in an effort to get the defendants to comply with the court's earlier orders. The district court awarded fees to the plaintiffs for their work on the 1989 contempt motion. *Id.* at 715. This Court in part concluded that the plaintiffs were entitled to fees for work done in pursuing the 1989 contempt action because "plaintiffs may rely on the trial court's 1985 order to establish that they are prevailing parties and, pursuant to that order, plaintiffs have succeeded on a significant issue." *Id.*

Seven years after *Glover*, in *Hadix v. Johnson*, 143 F.3d 246, 256 (6th Cir. 1998), we relied on *Glover* and affirmed that "when plaintiffs seek fees for compliance

monitoring, plaintiffs are not required to again establish prevailing party status, nor is the award dependent upon the outcome of an appeal." *Id.*, *aff'd in part, rev'd in part on other grounds*, 527 U.S. 343 (1999).  Plaintiffs sought fees for three sets of issues: (1) work performed that resulted in a voluntary dismissal on appeal; (2) work performed in opposing defendants' motion to terminate the district court's supervisory jurisdiction; and (3) work performed in having defendants' held in contempt—a decision that we later reversed on appeal.  *Hadix*, 143 F.3d at 257-58.

We held that plaintiffs were entitled to fees for work that resulted in the voluntary dismissal and for work opposing the motion to terminate supervisory jurisdiction.  That work, we explained, "qualifie[d] as compensable post-judgment compliance monitoring because plaintiffs sought to protect the remedy ordered by the District Court . . . so many years ago."  *Id.* at 258.  We also stated that when counsel requests fees for unsuccessful legal work unrelated to compliance monitoring or protecting a remedy, the test to be applied would be "whether the issues in the post-judgment litigation are 'inextricably intertwined with those on which the plaintiff prevailed in the underlying suit or whether they are distinct.'"  *Id.* at 257 (quoting *Jenkins v. State of Mo.*, 127 F.3d 709, 717 (8th Cir. 1997)).  When the issues are intertwined, we stated, plaintiffs would be entitled to fees regardless of their success. *Id.*  Only if the issues were distinct would plaintiffs have to be successful in order to recover.  *Id.*  Employing this rule, we did not permit fees for the third category of work (the contempt action that was later reversed) because "[g]iven the lack of any remedial order, plaintiffs' counsel's efforts might best be characterized as a failed attempt to expand the remedy."  *Id.* at 258 (citing *Ustrak v. Fairman*, 851 F.2d 983, 990 (7th Cir. 1988)).

*Delaware Valley*, *Glover*, and *Hadix* suggest that plaintiffs here can rely on their prevailing party status from the 2003 Consent Decree as a basis for a fee award for work performed defending that decree from defendants' attack regardless of their lack of complete success. *Hadix*, 143 F.3d at 257.  Were this the case, plaintiffs here would not have had to prevail, *i.e.*, obtain a material alteration of the legal relationship, in the

2005 Revised Consent Decree in order to be considered a prevailing party under § 1988. But the intervening Supreme Court decision *Buckhannon* requires a brief pause before drawing this conclusion.

In *Buckhannon*, the plaintiff sought declaratory and injunctive relief to bar enforcement of a West Virginia statute. 532 U.S. at 601. With the State's agreement, the plaintiff obtained a court-ordered preliminary injunction pending resolution of the case. *Id.* Ultimately, the State voluntarily repealed the statute and the district court denied the case as moot. *Id.* at 598. Plaintiffs later sought fees on the basis that after they filed suit, the state voluntarily eliminated the requirement plaintiffs had sued about. The Court rejected this "catalyst theory" of prevailing party status, explaining that "[a] defendant's voluntary change in conduct . . . lacks the necessary judicial *imprimatur* . . . ." *Id.* at 605. A defendant's voluntary transformation, the Court reasoned, does not amount to "a judicially sanctioned change" in the legal relationship between the plaintiff and defendant, as required to establish prevailing-party status. *Id.* at 604-05.

*Buckhannon* makes clear that, at least initially, a judicially sanctioned change in the parties' legal relationship, including through a consent decree, is required for prevailing party status. *Id.* at 604. But *Buckhannon* does not resolve the issue of whether litigation defending a prior judicially sanctioned change, *e.g.*, a consent decree, must likewise result in a judicially sanctioned material alteration of the parties' legal relationship in order to be compensable under § 1988. And in fact, the *Delaware Valley* decision (allowing recovery for work defending a consent decree from collateral attack in hearings before a government agency) seems to counsel against drawing such a hard line in the post consent-decree context. Accordingly, three of our sister circuits have rejected a rigid application of *Buckhannon* to post-decree work.

In *Johnson v. City of Tulsa*, 489 F.3d 1089, 1108 (10th Cir. 2007), the Tenth Circuit held that fees may be awarded for reasonable measures to enforce a consent decree even when those efforts do not produce a court order or judgment. The court rejected the argument that *Buckhannon* overturned or limited *Delaware Valley*, noting that *Buckhannon* did not even mention *Delaware Valley*. *Id.* at 1108. Instead, the court

concluded that post-decree compensation may be appropriate whenever plaintiffs' counsel protects "the fruits of the decree," for example by protecting the decree's mechanisms for dealing with an ongoing problem, even if the defendants' actions in ultimately complying with the decree were voluntary.  *Id.* at 1109.

Similarly, in *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 452 (9th Cir. 2010), the Ninth Circuit concluded that fees for post-settlement-agreement monitoring were compensable after *Buckhannon* even if the monitoring did not produce a court order.[9]   The court reasoned that its own precedent dictated such a result and "[i]n *Buckhannon*, the Court did not mention, much less over-rule, *Delaware Valley*." *Id.; see also Balla v. Idaho*, 677 F.3d 910, 917-18 (9th Cir. 2012) (affirming *Prison Legal News* and stating, "*Buckhannon* speaks to the case where there never has been judicially ordered relief.  *Delaware Valley* speaks to the case where there has been judicial relief, though the monitoring work is subsequent to the judicial order and produces no new order."); *Cody v. Hillard*, 304 F.3d 767, 773 (8th Cir. 2002) (relying on *Buckhannon* to conclude that a consent decree can establish prevailing party status, but holding that the post-decree compliance monitoring in that case was compensable under the "inextricably intertwined" test established in its prior case, *Jenkins*).

In contrast to *Johnson*, *Prison Legal News*, *Balla*, and *Cody*, in  *Alliance to End Repression v. City of Chicago*, 356 F.3d 767 (7th Cir. 2004), the Seventh Circuit applied *Buckhannon's* limitations more rigidly in the post-decree context.  In *Alliance*, the parties entered into a consent decree in 1981.  *Id.* at 768.  The decree did not vest any monitoring or enforcement responsibilities in the plaintiffs or their attorneys.  *Id.* Twenty years later, after two failed contempt proceedings, a failed opposition to defendants' motion to modify the decree, and a failure to monitor the defendants'

---

[9]Post-settlement-agreement litigation (as opposed to post-consent decree) is not at issue in this case, but there is a question whether settlement agreements can even be the basis of prevailing party status. *See Buckhannon*, 532 U.S. at 604 n.7 ("We have . . . characterized the *Maher* opinion as also allowing for an award of attorney's fees for private settlements . . . . But this dictum ignores that *Maher* only 'held that fees *may* be assessed ... after a case has been settled by the entry of a consent decree.'  Private settlements do not entail the judicial approval and oversight involved in consent decrees.  And federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal.") (internal citations omitted).

compliance with the decree, the plaintiffs sought attorney's fees.  *Id.* at 769.   The plaintiffs relied on *Delaware Valley* in asserting that the 1981 consent decree gave them prevailing party status and thus they were entitled to ongoing attorney's fees for filing contempt actions and opposing changes to the decree regardless of the results obtained. *Id.* at 769.

The court found it significant that the plaintiffs' claims for fees were based in part on a fictional "duty" they claimed arose from the original decree, even though the decree itself imposed no such duty.  *Id.* at 772.  But ultimately,  the court concluded that "if [post-decree work] does not produce a judgment or order, then under the rule of *Buckhannon* it is not compensable."  *Id.* at 771.  *Alliance* did not make clear the extent to which the decision depended upon the fact that the consent decree in the case did not vest plaintiffs with any duties to defend or monitor compliance.  And a broad rule that no post-decree work is compensable absent a court order would seem to conflict with *Delaware Valley*, which permitted fees for plaintiffs' monitoring work following a consent decree.

And in fact, the *Alliance* court recognized that *Delaware Valley* was not helpful to the plaintiffs because the *Delaware Valley* plaintiffs "were at least partially successful" in the post-judgment proceedings, whereas in *Alliance*, there had been "nothing but loss—a million dollars' worth of legal services poured down the drain. There was not even a disappointing partial success, as there would have been if the City had moved to dissolve the decree and the plaintiffs had fended off dissolution yet had not averted a substantial modification."  *Id.*  at 769-70.

We agree with the circuits noting that *Buckhannon* did not discuss *Delaware Valley*.  Yet, we are hesitant to conclude from that observation that *Buckhannon* has no import in the post-decree context.  In fact, the rationale underlying *Buckhannon's* limitations in the pre-decree or pre-judgment context—avoiding fact-intensive and time-consuming satellite litigation—suggests that we should also accord it some weight in the post-decree context.  The real question is how much work it should do given these contextual differences, *i.e.*, before there has been any judicially-sanctioned material

alteration of the parties' legal relationship or after such an alteration.  Even after a consent decree, does *Buckhannon* completely foreclose fee recovery unless there is another judicial order materially altering the parties' legal relationship that essentially re-qualifies the plaintiffs for fees under § 1988?

We conclude that reading *Buckhannon* as completely precluding fees absent a subsequent material alteration in the parties' relationship goes too far.  However, requiring that work spent defending or enforcing a decree must result in a court order or agency determination that at least "secure[s] [plaintiffs'] initial success in obtaining the consent decree," *Delaware Valley*, 478 U.S. at 558, seems to give proper effect not only to *Buckhannon,* but also to *Delaware Valley* and more recent § 1988 decisions from the Court.  *See, e.g., Sole v. Wyner*, 551 U.S. 74, 78 (2007) (rejecting § 1988 fees for a successful preliminary injunction after a later permanent injunction was denied,  and explaining "A plaintiff who achieves a transient victory at the threshold of an action can gain no award under [§ 1988] if, at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded.").

Accordingly, we conclude that an earlier judicially sanctioned change in the parties' legal relationship through a consent decree can be the basis of a plaintiff's prevailing party status for purposes of § 1988. *Hadix*, 143 F.3d at 256.  After that initial determination, plaintiffs are not again required to establish prevailing party status in the conventional sense of requiring a judicially-sanctioned material change in the legal relationship of the parties.  *Tx. State Teachers Ass'n*, 489 U.S. at 792; *Buckhannon*, 532 U.S. at 604-05 (emphasis added).  However, that does not mean that plaintiffs will be able to recover for all post-consent-decree work regardless of whether they are successful.  Instead, consistent with *Delaware Valley* and *Buckhannon*, any action by a plaintiff to defend or enforce a prior consent decree must be "necessary to enforce" the prior order and result in a subsequent court order or agency determination that at the very least "secure[s] [plaintiffs'] initial success in obtaining the consent decree." *Delaware Valley*, 478 U.S. at 558-59.  Compensation for post-consent decree work cannot be based on a defendants' voluntary change in behavior,  *Buckhannon*, 532 U.S.

at 604-05, nor can it be based on a total loss, *e.g.*, where a motion to modify is granted in whole and plaintiffs have not retained any protections of the prior decree. *Sole,* 551 U.S. at 78.

This is not only consistent with the Supreme Court's § 1988 decisions, but also with the notion that the purpose of § 1988 is not to generate "satellite" disputes over fees. *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992); *see also Hensley*, 461 U.S. at 437 (asserting that a fee request "should not result in a second major litigation."). As we observed in *McQueary*, "fact-based and speculative inquiries into why government bodies altered their conduct . . . tend to 'distract . . . from,' not further, § 1988's goal of encouraging adequate representation for civil rights plaintiffs . . . and waste scarce judicial resources on questions 'which [are] almost impossible to answer . . . .'" 614 F.3d at 598 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 791) (internal citation omitted). Accordingly, even in the post-consent-decree context, courts should not be charged with having to determine a "defendant's subjective motivations in changing its conduct . . . ." *Buckhannon*, 532 U.S. at 609.

Moreover, § 1988 was not enacted to create a cottage industry for class action attorneys that would grant them "lifetime income by bringing and losing a series of actions to enforce the decree and charging the expense to the City and thus to the taxpayers." *Alliance*, 356 F.3d at 773 ("The class-action device is not intended to be a lawyers' gravy train."); *see also Hensley,* 461 U.S. at 446 (Brennan, J., concurring and dissenting) ("Congress also took steps to ensure that § 1988 did not become a 'relief fund for lawyers.'") (quoting 122 Cong. Rec. 33,314, remarks of Sen. Kennedy); *Farrar*, 506 U.S. at 115 ("fee awards under § 1988 were never intended to produce windfalls to attorneys . . . .") (internal quotation and citation omitted).

In accord with this principle, the Supreme Court has limited fee awards in several instances. *See, e.g., Perdue*, 130 S. Ct. at 1676 (restricting fee enhancements for superior attorney performance because although "Section 1988 serves an important public purpose by making it possible for persons without means to bring suit to vindicate their rights . . . unjustified enhancements that serve only to enrich attorneys are not

consistent with the statute's aim."); *Dague*, 505 U.S. at 566-67 (disallowing a fee enhancement for the risk involved with taking a case under a contingency fee agreement); *Sole*, 551 U.S. at 78 (disallowing fees for successful permanent injunction where later permanent injunction denied); *Hensley*, 461 U.S. at 433 (explaining that the fee award should be limited to the scope of plaintiffs' success).

On the other side of the coin, if defendants know that a court order is going to trigger fees, this creates some incentive to resolve a post-decree skirmish without dragging out the litigation. Indeed, as noted by the Tenth Circuit in *Johnson*, "the decree itself can spell out what efforts by plaintiffs' counsel are to be compensated. Indeed, the amount of litigation on the subject suggests that explicit provisions in consent decrees would be a boon for all concerned . . . ." 489 F.3d at 1109; *see also Buckhannon*, 532 U.S. at 609 (explaining that given a defendant's potential liability even after a voluntary change in conduct, there is "a strong incentive to enter a settlement agreement, where [a defendant] can negotiate attorney's fees and costs.")

In sum, plaintiffs may rely on a prior consent decree that materially altered the parties legal relationship as the basis for establishing prevailing party status under § 1988. *Hadix*, 143 F.3d at 256. But in order to recover fees for work performed enforcing or defending that prior decree, plaintiffs have to show that the work was "necessary to enforce" the prior decree or judgment and resulted in a court order or agency determination that at the very least "secured [plaintiffs'] initial success in obtaining the consent decree." *Delaware Valley*, 478 U.S. at 558-59.

In this case, the 2003 Consent Decree established that plaintiffs were prevailing parties under § 1988. App. 391. Moreover, counsel's work defending the 2003 decree resulted in a court order (the 2005 Revised Consent Decree) that at least in part secured their initial success in the 2003 Consent Decree. Several examples will suffice to make the point.

In its motion to modify, defendants sought to preclude appeals involving provider inaction, but the district court denied the portion of these modifications that would have deprived the enrollee of the right to notice and a hearing. *Grier v. Goetz*, 402 F. Supp.

2d 876, 917, 918 (M.D. Tenn. November 15, 2005).  Similarly, defendants wanted to discontinue paying for medical services or prescriptions pending an enrollee's appeal for denial of prior authorization or coverage (something that the 2003 Consent Decree specifically required).  The court denied this modification as to certain ongoing or unlimited prescriptions, stating "the State or its contractor must comply with Paragraph C(8) of the 2003 Consent Decree, requiring continuation or reinstatement of benefits pending an appeal."  *Id.* at 919-20.  Defendants also sought to deny payment during a pending appeal if the enrollee failed to pay the co-payment, but the court denied this modification as well.  *Id.*  The court also denied defendants' attempt to prohibit enrollee appeals when the item or service sought has not been ordered or prescribed by a provider.  *Id.* at 924.  It similarly refused defendants' effort to modify the 2003 Consent Decree to shift the burden of proving medical necessity for a service to the provider, where the 2003 decree contained a presumption that the provider's judgment was correct.  *Id.* at 928.  Further, defendants attempted to modify the 2003 Consent Decree's time limitations for filing and resolving medical appeals.  *Id.* at 931.  The court denied the request in part, explaining  that "[t]he State has not shown that the 2003 Consent Decree's overall thirty-one-day time-line for expedited appeals is unreasonable or unduly burdensome, nor has the State provided an alternative time-line that is suitably tailored to [the] circumstances."  *Id.* at 932.  Finally, defendants requested complete termination of the 2003 Consent Decree, but the court also denied this request, concluding that "the protections afforded by the Decree are essential . . .," and that "'continuing enforcement and supervision of the consent decree [is] essential to achieving the [2003 Consent Decree's] purposes and protecting plaintiffs' rights.'"  *Id.* at 938 (quoting *Heath v. DeCourcy*, 992 F.2d 630, 634 (6th Cir. 1993)).

We agree with the district court that plaintiffs' success in opposing modification of the 2005 decree was clearly limited.  But "the prevailing party inquiry does not turn on the magnitude of the relief obtained." *Farrar*, 506 U.S. at 114.  Instead, plaintiffs' limited success goes to the reasonableness of the fee award. *Id.* ("the most critical factor in determining the reasonableness of a fee award is the degree of success obtained.")

(internal quotations omitted).  Accordingly, we next address the reasonableness of the fee award in light of plaintiffs' limited success.

**V.**

Defendants next challenge the reasonableness of the district court's $2.57 million award to plaintiffs.  In particular, they question whether the district court abused its discretion in its determination regarding several categories of work plaintiffs claim were reasonably expended opposing modification of the 2003 Consent Decree, and whether the court erred by reducing the fee award by only twenty-percent.  We hold that it erred in both respects.

**1.**

Reasonable attorney's fees under § 1988 should be calculated according to the prevailing market rates in the relevant community.  *Mo. v. Jenkins by Agyei*, 491 U.S. 274, 285-86 (1989).  "A court should compensate the plaintiff for the time his attorney reasonably spent in achieving the favorable outcome, even if 'the plaintiff failed to prevail on every contention.'"  *Fox v. Vice*, 131 S. Ct. 2205, 2214 (2011) (quoting *Hensley*, 461 U.S. at 435).

A "court's initial point of departure, when calculating reasonable . . . fees, is the determination of the fee applicant's 'lodestar,' which is the proven number of hours reasonably expended on the case by an attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005) (citing *Hensley*, 461 U.S. at 433).  "The district court . . . should exclude from this initial fee calculation hours that were not 'reasonably expended.'"  *Hensley*, 461 U.S. at 434 (quoting S. Rep. No. 94-1011, at 6 (1976) ("counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, for all time reasonably expended on a matter.") (internal quotations omitted)).  This means that "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary," and thus "[h]ours that are not properly

billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Id.* at 434. (quotations omitted).

"Generally, the trial judge's exercise of discretion in statutory fee award cases is entitled to substantial deference, especially when the rationale for the award was predominantly fact-driven." *Adcock-Ladd v. Sec'y of Treas.*, 227 F.3d 343, 349 (6th Cir. 2000) (citing *Hensley*, 461 U.S. at 437). "Although the trial court's discretion in fee award cases sweeps broadly, it is not absolute." *Id.* The district court still must "provide a concise but clear explanation of its reasons for the fee award." *Hensley*, 461 U.S. at 437. "We affirm unless the court's ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the record." *Isabel*, 404 F.3d at 415.

After the initial lodestar calculation, the district court has discretion to adjust the award based on relevant considerations "peculiar to the subject litigation." *Adcock-Ladd*, 227 F.3d at 349. The factors which the district court may consider in determining such adjustments include the twelve listed in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *See Hensley*, 461 U.S. at 434 n.9 (stating that district courts may rely on the *Johnson* factors). The "most critical factor [in the adjustment calculation] is the degree of success obtained." *Id.* at 436.

In this case, defendants do not specifically challenge the number of hours as such (11,525 in total) or the hourly billing rates. They only challenge the district court's determination regarding the categories of work that were "reasonably expended" on the litigation, and the court's twenty-percent reduction. In particular, defendants challenge the district court's inclusion of plaintiffs' monitoring activities,[10] counsel's work on other cases, work performed on an unsuccessful motion for preliminary injunction, work

---

[10]As stated above, *see supra* note 8, we are not deciding the extent to which monitoring compliance with an earlier consent decree is compensable. Though defendants' brief on appeal broadly challenges fees for "monitoring activities" awarded to plaintiff, it is not specific as to precisely what monitoring activities they are challenging. Moreover, in its fee award, the district court divided its analysis of plaintiffs' work into two distinct categories: (1) work performed defending the 2003 Consent Decree and (2) work performed monitoring the Consent Decree. (08/13/09 Order, Page ID # 15810). It then subdivided those two categories into eight subcategories. Defendants' appeal specifically challenges only four of those eight subcategories, and the thrust in each of those subcategories is work spent defending or enforcing the consent decree.

performed opposing intervenors, and counsel's work conducting policy analysis, political negotiations, and lobbying.  Appellant's Br. at 38-54.  We will discuss each in turn.

## 2.  Counsel's work on other cases

### a.  work in *Rosen*

Defendants assert that plaintiffs' counsel's work on several other cases was not reasonably expended opposing defendants' requested modifications to the 2003 Consent Decree.  Plaintiffs' counsel were also counsel in another class action, *Rosen v. Goetz*. The *Rosen* case involved "requirements related to due process rights for persons applying for TennCare or being disenrolled from TennCare."  App. 757.[11]  In *Rosen*, plaintiffs' counsel had already conducted some discovery, including taking the depositions of the Commissioner and Assistant Commissioner of TennCare, Darin Gordon and J.D. Hickey respectively.  R. 1442-1, 1442-2 (documenting depositions taken 03/08/05 and 03/10/05).

Plaintiffs' counsel were ultimately *unsuccessful* in the *Rosen* litigation, but in order to accommodate defendants' request to expedite the proceedings in this case, the parties agreed to forgo written discovery, plaintiffs agreed to withdraw interrogatories and document requests, and the parties agreed to use "all or part of transcripts of depositions and testimony taken in *Rosen v. Goetz* during the proceedings through April 7, 2005 . . . ."  App. 851; *see also* App. 829-32  (attorney for TennCare discussing that the discovery in *Rosen* could be used in this case); App. 837-838 (defendants' attorney discussing "urgent time pressure" to have a hearing in this case and also stating he agreed that much of the discovery in *Rosen* was relevant, "useful," and "transferable" to the issues in this case, but also stating the focus in this case—modifying specific decree provisions—was different from *Rosen*, which focused on whether disenrollments

---

[11]As here, there was a consent decree that resulted from the *Rosen* litigation.  *See Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 921 (6th Cir. 2002) (describing the litigation leading to the consent decree).

were warranted).   Ultimately, plaintiffs' fee request included 2,110.9 hours for work defendants claim plaintiffs performed in *Rosen*.

Defendants concede in their opening brief that the "hearing in *Rosen* yielded evidence pertaining to the fiscal crisis that, to be sure, sparked both the disenrollments at issue in *Rosen* and the need to modify the consent decree in this case."  Appellant's Br. in 10-6005 at 45.  Defendants also concede that plaintiffs used some of this evidence in their effort to oppose the defendants' motion to modify the 2003 Consent Decree in this case.  Appellant's Br. in 10-6005 at 45.  Yet, they argue that the *Rosen* action was a completely separate case with different plaintiffs and thus counsel's work in that separate action should not be compensable in this case.  We agree.

In *Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234, 242-43 (1985), the Supreme Court upheld the denial of fees for work performed in separate proceedings. In that case, a former school teacher challenged the termination of his employment both before the local school board and in court.  After prevailing in the judicial action by securing a consent decree,  his attorney sought fees for time spent examining witnesses and considering and refuting opposing arguments in the school board hearings.  He argued that "the work was analogous to discovery, investigation, and research that are part of any litigated proceeding," and was thus "'reasonably expended' in preparation for the court action."  *Id.* at 240, 242.  The Supreme Court rejected this argument.

The Court reasoned that "[t]he time that is compensable under § 1988 is that 'reasonably expended *on the litigation*.'"  *Id.* at 242 (quoting *Hensley*, 461 U.S. at 433) (emphasis added by *Webb*).  The Court further concluded that because § 1988 allows fees "as part of the costs" of the "action or proceeding" brought to enforce a civil rights statute, "it is difficult to treat time spent years before the complaint was filed as having been 'expended on the litigation' or to be fairly comprehended as 'part of the costs' of the civil rights action."  *Id.* (quoting *Hensley*, 461 U.S. at 433; 42 U.S.C. § 1988).

Though the Court recognized that some work performed before formal litigation may be compensable, for example drafting pleadings or developing a case theory, it stated that in that case, the work in the administrative proceedings was clearly separable

from the litigation, and Webb had not shown it was "both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement." *Id.* at 243.

One year after *Webb*, the Court decided *Delaware Valley*. That case in part held that work spent defending a prior consent decree from the defendants' collateral attack on the decree in an administrative hearing was compensable because it was "'useful and of a type ordinarily necessary' to secure the final result obtained from the litigation." 478 U.S. at 561 (quoting *Webb*, 471 U.S. at 243). The original decree in that case had established a geographic boundary within which the state was to implement a vehicle inspection program. The state went to the EPA in an effort to reduce the size of the program area. *Id.* at 552-53. Plaintiffs' counsel attended the EPA hearing to defend the original decree. The Court reasoned that "participation in these administrative proceedings was crucial to the vindication of Delaware Valley's rights under the consent decree," *id.* at 561, because the EPA was "a regulatory agency with power to modify the substance of the program ordered by the court," *id.* at 558.

Plaintiffs' fee request here for work related to the *Rosen* matter is clearly distinguishable from the work found compensable in *Delaware Valley*. First, the work in *Rosen* had nothing to do with efforts to defeat a collateral attack on the consent decree before an agency with the power to modify the substance of the decree. Rather, the decision to use the materials from *Rosen* was more a matter of timing and convenience for the parties. Second, even if the *Rosen* materials were somehow "useful and of the type ordinarily necessary to advance" the litigation, *Webb*, 471 U.S. at 243, they do not satisfy the more primary requirements recognized in *Webb* that § 1988 authorizes fees only for time reasonably expended *on the litigation*—in other words, time spent *in this case*—or that the fees be assessed only "as part of the costs" of the civil rights "action or proceeding"—in other words, time spent *in this case*. Third, as in *Webb*, the work conducted in *Rosen* is clearly separable from the work in *Grier* (this case); after all, they

were two completely separate cases with two different case numbers, two different judges, and a different group of plaintiffs.  *See* 471 U.S. at 243.**12**

Moreover, we are troubled by the idea of ever permitting plaintiffs' counsel to receive fees for work performed in a completely separate case.  Doing so could lead to all sorts of oddities, as illustrated by this case where counsel would be permitted to recover fees for thousands of hours of time spent litigating a case they *lost*.  Just as it would be ridiculous to allow counsel to collect fees for time spent drafting a brief in a prior losing case and then recycling it in another case, it seems similarly incongruous to allow counsel to be compensated for time spent conducting discovery in a completely separate matter.

Further, in cases like this one where the defendant in the two actions is the same, we would be creating an incentive for plaintiffs' counsel to try to persuade the defendant to use materials from a different case under the guise of convenience or cost, when in fact it is unlikely plaintiffs' counsel would even be permitted to duplicate its discovery efforts in the new case.  *See In re Park West Galleries, Inc., Litigation*, 887 F. Supp. 2d 1385, 2012 WL 3610031, at *1 (Judicial Panel on Multidistrict Litigation Aug. 23, 2012) (discussing that in multiple actions sharing common factual questions with the same defendant, best practices "avoid duplicate discovery . . . . and conserve the resources of the parties, their counsel, and the judiciary.").

Accordingly, we hold that fees under § 1988 are not recoverable for work performed in a completely separate case, even if, as here, that case involves the same defendant, and even if the defendant agrees to use the materials from the separate case in the present action.  If attorneys want fees for work performed in the separate action,

---

**12**We have previously passed upon the question of fees for work spent in pre-litigation administrative hearings and other ancillary actions in two unpublished opinions.  In *Cox v. Shelby State Cmty. Coll.*, 194 F. App'x. 267, 277-78 (6th Cir. 2006) (per curiam), we affirmed an award of attorney's fees including 308 hours spent in preparation for a required state formal tenure termination hearing.  This decision is consistent with the discussion in *Webb*, though irrelevant for our purposes here, suggesting that work conducted pursuant to a statute requiring administrative exhaustion prior to filing suit may be compensable.  In the other case, *Grand Traverse Band of Ottawa & Chippewa Indians v. Dir. Mich. Dep't of Nat. Res.*, 1998 WL 385891, at *7 (6th Cir. 1998), we affirmed a denial of fees for work in ancillary criminal and civil proceedings on the basis that the defendants were not parties to the earlier matters, and we doubted whether the hours in the earlier matters were "necessary or useful to the resolution" of the case on appeal.  Neither of these unpublished opinions dictates the outcome in this case.

whether for discovery or time spent drafting a brief, they can seek fees in that separate action. This is not to say that the parties could not negotiate the amount of fees and what work would be compensated in an action seeking to modify a consent decree. But that did not happen in this case.

Counsel argued below that defendants' expert miscategorized some of these hours as "in *Rosen*" when in fact the hours were actually spent in this case and logged in this case. Specifically, counsel challenged 37 entries in category six. R. 1507, Bonnyman Decl. at 5. Our review of the record indicates that the bulk of the 2,110.9 hours were spent in the *Rosen* case and thus should not be allowed. Additionally, of the 37 entries counsel challenges in category six, many are ambiguous with respect to whether they were reasonably expended in this case. *See, e.g.*, Weitzner Decl., entry 961 ("researched legal issue"); *id.*, entry 1457 ("reviewed discovery documents"). Those hours should also be disallowed because counsel failed to establish that they were in fact reasonably expended in this litigation and not in *Rosen*. However, there are some entries that do correspond with actions on the docket in this case. *See, e.g.,* Weitzner Decl., entry 1197 ("revised and file response to scheduling motion"). As such, we vacate the district court's award for the 2,110.9 hours, and remand for a determination of how many of the 37 challenged entries in category six correspond to actions reasonably expended *in this case*.

### b.   work in *John B.*, *Ware*, and *Daniels*

Defendants also challenge the district court's award for work by plaintiffs' counsel involving several other cases.

*John B.* was a separate matter involving a subclass of the plaintiffs in this case. The record shows that defendants perceived some impropriety on the part of Judge Nixon (the district judge in this case) in the *John B.* case and thus filed a motion in this case to take the deposition of the Special Master appointed in *John B.* R. 994. Defendants' rationale was that "the concerns surrounding ex parte communications in *John B.* necessarily and equally extend to [this case]." App. 908. Plaintiffs' counsel filed a ten-page response, and the district court entered an order denying defendants'

motion. Plaintiffs sought fees for 70.4 hours of work, but it is not clear from the briefing whether those fees solely related to the work responding to defendants' motion or whether it was for work in a different *John B.* fees category, "*John B.* medical treatment issues." *See* R. 1507 Bonnyman Decl. at 7. Defendants' brief on appeal is similarly non-specific about which *John B.* matters they challenge, though our review of the record and the hours associated with both categories seem to indicate they must be challenging both. *See* Weitzner Decl., Exh. B., R. 1484-1, Page ID # 12741-742.

That said, with respect to plaintiffs' response to defendants' motion to depose the special master filed in this case, we cannot discern from the record how plaintiffs' response in any way "secured [plaintiffs'] initial success in obtaining the consent decree," *Delaware Valley*, 478 U.S. at 558, or whether it was in any manner "necessary to enforce the prior remedy ordered by the District Court." *Id.* Even if defendants' discovery had resulted in Judge Nixon's recusal, there is no evidence that this would have in any way affected plaintiffs' opposition to defendants' motion to modify, or resulted in a different outcome relative to the 2005 Revised Consent Decree.

Moreover, to the extent defendants challenge the work categorized as "*John B.* medical treatment issues," the record similarly does not establish that this time is compensable as necessary to enforce the prior remedy resulting in the 2005 decree. Accordingly, we vacate the district court's award for the 70.4 hours.

Defendants next contest 3.0 hours of fees for counsel's work related to *Ware v. Goetz*. *Ware* involved a subclass of plaintiffs from this matter, but with different counsel, who successfully sought injunctive relief to enforce the due process rights established in the 2003 Consent Decree. After an appeal in *Ware*, the parties agreed on remand to consolidate several of the issues in *Ware* with this case. R. 1507, Bonnyman Decl. at 10. Plaintiffs' counsel alleges that he spent three hours consulting with the *Ware* attorneys regarding "this litigation, the terms of the Consent Decree and the implications of consolidation . . . ." R. 1507, Bonnyman Decl. at 10. While we presume that these discussions were helpful for efficiently managing the case, there is nothing to indicate that they in any way helped to secure plaintiffs' success from the 2003 Consent

Decree or that they were necessary to enforce the prior order.  Counsel does not claim that the *Ware* plaintiffs had different theories of the case or that their involvement would have in any way undermined the progress plaintiffs' counsel had already made. Accordingly, we vacate the 3.0 hours spent on the *Ware* matter.

Finally, defendants challenge 13.0 hours counsel spent on the *Daniels* matter. As stated by the district court, *Daniels* was not a separate case, but the name of this case at a previous time.  In a footnote, defendants claim that "*Daniels* had nothing to do with the consent decree," Appellant's Br. in 12-5532 at 50 n.10, and the billing entries for these 13 hours suggest this may be correct.  The entries show that these hours were spent investigating possible violations of the 2003 Consent Decree as applied to specific individual class members.  *See, e.g.*, Weitzner Decl., entry 485 ("conference w/ co-counsel re. *Daniels* violation: terminating former SSI recipient's TennCare").  Either way, the record does not establish that these investigations were necessary to enforce the prior remedy and resulted in the 2005 Revised Consent Decree.  Accordingly, we vacate the district court's award for these 13.0 hours.

### 3. Work on the preliminary injunction related to the HAT contract

Defendants next challenge the award to plaintiffs for their efforts to temporarily enjoin the defendants from implementing a contract provision that would have reduced the number of appeals filed by Health Assist Tennessee ("HAT") on behalf of disabled children.  The 2003 Consent Decree required defendants not to "reduce or terminate current contractual arrangements with private entities that assist . . . beneficiaries through the appeal process without the agreement of the plaintiffs or prior approval of the Court, based upon a showing that such changes will not impair access to the appeal process for people with disabilities."  App. 385.  When the 2003 decree took effect, defendants had a contract with HAT, a private entity assisting children with TennCare appeals.  When that contract was set to expire, defendants sent HAT a new contract. Plaintiffs' counsel claimed that the new contract made it more difficult for HAT to advocate for children and sought to enjoin defendants from implementing the new contract.

The district court held a hearing on the matter at which a HAT compliance officer and the CAO of TennCare testified. HAT's compliance officer testified that she was not as concerned about the contract imposing problems for HAT in its ability to advocate, but rather that the changes would keep HAT from being able to meet its own obligations under the 2003 Consent Decree. She also testified that HAT employees would need guidance on how the new provisions should be applied.

After the hearing, the court ordered the two individuals to meet without attorneys to discuss HAT's concerns with the contract. According to the district court, during the two-day meeting, the individuals agreed in a letter to implementation guidelines for the new contract provision, thereby satisfying HAT's concerns. The court treated the letter as binding, and in so doing incorporated it into the 2007 contract. *Grier v. Goetz*, No. 3:79-3107, slip op. at 35-36 (M.D. Tenn. August 13, 2009).

Ultimately, the court *denied* plaintiffs' request for an injunction, concluding that "Plaintiff has failed to show that the changes violate . . . the Consent Decree because they do not present sufficient evidence that the Contract will keep the children in question from being able to effectively exercise their appeal rights . . . [n]or [did Plaintiff] demonstrate that children with disabilities would be impaired from the appeals process by the new contract amendments." R. 1412 at 5. According to defendants, plaintiffs' counsel requested 344.4 hours for work related to its ultimately unsuccessful injunction.

Under the standard we adopt today, the relevant question would be whether counsel's action in filing the motion for an injunction was "necessary to enforce" the 2003 Consent Decree and resulted in a court order or agency determination that at the very least "secured [plaintiffs] initial success." *Delaware Valley*, 478 U.S. at 558. While it may be the case that plaintiffs' counsel's actions in filing the injunction helped to flesh out how HAT's contract with the state would be implemented, there was no court order that secured plaintiffs' success in the 2003 decree. In fact, the district court even recognized that plaintiffs failed to show that the unexplained changes in the new HAT contract would violate the earlier decree. Moreover, any assistance the letter

provided was not relevant to the only court-ordered relief in this case, the 2005 Revised Consent Decree. Thus, their unsuccessful injunction does not even fall under "the sound and settled principle that attorneys' fees incurred in interim defeats en route to a successful conclusion are compensable because . . . such skirmishes are indispensable inputs into a successful conclusion of litigation." *Alliance*, 356 F.3d at 771. Accordingly, we vacate the award for these 344.4 hours.

However, in proceedings below, plaintiffs argued that defendants' fees expert erroneously placed 22 billing entries unrelated to the injunction into this category. R. 1507, Bonnyman Decl. at 7-8. Our review of the record indicates there may be some merit to this assertion. *See, e.g.,* Weitzner Decl., entry 4205 ("conferred with Marjorie Bristol and Gordon Bonnyman re: revisions, Paragraph C(7) of Consent Decree"). Accordingly, we remand for reassessment of the 22 contested entries in this category.

### 4. Work opposing plaintiff-intervenors

Defendants next argue that the district court erred by granting plaintiffs a fee award for work opposing several plaintiff-intervenors who *supported* the state's motion to modify the 2003 Consent Decree. Unlike the other members of the plaintiff class who faced benefit reductions or other changes to TennCare coverage, the intervenors faced disenrollment. Modification of the 2003 Consent Decree was one condition, memorialized in an Memorandum of Understanding ("MOU") with defendants, that had to be met before defendants would initiate a program potentially saving several thousand TennCare members, including plaintiff-intervenors from disenrollment. *See Rosen*, 410 F.3d at 925. Counsel claims they spent 306.2 hours opposing plaintiff-intervenors, including 17.5 hours challenging the MOU and 288.7 hours negotiating and litigating issues arising out of plaintiff-intervenors' intervention.

Because the intervenors took a position contrary to the plaintiffs here, it appears as though this work is compensable as being "necessary to enforce" the 2003 Consent Decree and resulting in a court order, the 2005 Revised Consent Decree, that at the very least secured the initial success of the 2003 Consent Decree. *Delaware Valley*, 478 U.S.

at 558. But defendants claim this work is not compensable for a different reason—the Supreme Court's decision in *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754 (1989).[13]

In *Zipes*, a class of female flight attendants sued Trans World Airline for sex discrimination. The parties entered into a settlement agreement in which the airline agreed to credit the class members with seniority. *Id.* at 755-56. The flight-attendants' union intervened in the suit on behalf of those flight attendants who would be adversely affected by the seniority given to the class members under the settlement agreement. *Id.* at 757. In part, they claimed that the terms of the settlement agreement would violate the attendants' collective-bargaining agreement. *Id.* The intervenors' challenge was rejected, and the plaintiffs' class requested that the unsuccessful intervenors pay plaintiffs' fees for having to litigate these issues. *Id.*

The Court held that intervenors would only be liable for fees if the intervenors' action was "frivolous, unreasonable, or without foundation." *Id.* at 761. The decision noted that it is not necessary to assess fees against "blameless intervenors" because "[i]n every lawsuit in which there is a prevailing Title VII plaintiff there will also be a losing defendant who has committed a legal wrong. That defendant will . . . be liable for all of the fees expended by the plaintiff in litigating the claim *against him* . . . ." *Id.* (emphasis added). Assessing fees against the intervenor, the Court asserted, was "not essential" to "vindicate the national policy against wrongful discrimination." *Id*. *Zipes's* rationale is rooted in two considerations. First, parties who have not been found to have violated an individual's civil rights should not be liable for fees. Second, making plaintiff responsible for those fees would not destroy the incentive to sue for civil rights violations because a prevailing plaintiff could still get fees for expenses incurred litigating his or her claims against the defendant. *Id.*

The Court's decision also clearly implies that even though defendants are liable for the successful claims against *them*, they are not responsible for paying for plaintiffs'

---

[13]*Zipes* was a Title VII case, but the Court noted that the identical fee-shifting phrases in Title VII § 706(k) and 42 U.S.C. § 1988 "are to be interpreted alike." *Zipes*, 491 U.S. at 758 n.2.

litigation against intervenors. *Id.* at 761-62 ("Respondents argue that [the incentive to sue] will be reduced by the potential presence of intervenors whose claims the plaintiff must litigate without prospect of fee compensation.").

Justice Blackmun picked up on this implication in his concurring opinion where he criticized the majority for "tacitly assum[ing] that the defendant's fee liability goes no further" than claims "'against him.'" *Zipes*, 491 U.S. at 767 (Blackmun, J., concurring) (quoting 491 U.S. at 761). Justice Marshall's dissent also criticized the majority's assumption that intervention-related fees should be borne by the plaintiff. *Id.* at 775.

Several circuits have addressed, in various factual and procedural contexts, whether *Zipes* precludes a defendants' liability for fees for plaintiffs' expenses involving a third-party intervenor. *See, e.g.*, *Jenkins by Agyei v. State of Mo.*, 967 F.2d 1248, 1250-51 (8th Cir. 1992); *San Francisco N.A.A.C.P. v. San Francisco Unified Sch. Dist.*, 284 F.3d 1163, 1168 (9th Cir. 2002); *Rum Creek Coal Sales v. Caperton,* 31 F.3d 169, 177 (4th Cir. 1994); *Bigby v. City of Chicago*, 927 F.2d 1426, 1428 (7th Cir. 1991).

Applied to the facts of this case, we conclude that *Zipes* discourages sticking defendant with the bill for plaintiffs' litigation against plaintiff-intervenors. The opinion clearly implies that those costs should be borne by plaintiffs, *Zipes*, 491 U.S. at 761-62, particularly in a context where making plaintiffs bear the financial responsibility for time spent litigating against plaintiff-intervenors is not going to destroy the incentive to sue for civil rights violations. *Id.* Moreover, that portion of the *Zipes* opinion was specifically criticized by the concurring and dissenting opinions; yet the majority preserved the language that a defendant would only be responsible for those claims "against him." *Id.* at 761.

It is important to recall that Congress's intent in enacting § 1988, as an exception to the "American Rule" that each party in a lawsuit should bear its own fees, was not to allow plaintiffs' counsel to recover fees for everything, *see Hensley,* 461 U.S. at 446 (Brennan, J., concurring and dissenting) ("Congress also took steps to ensure that § 1988 did not become a 'relief fund for lawyers.'") (quoting 122 CONG. REC. 33,314 (Sept. 29,

1976) (remarks of Sen. Kennedy) (also stating in his remarks, "No, this bill is not for the purpose of aiding lawyers.  The purpose of this bill is to aid civil rights"); *Farrar*, 506 U.S. at 115 ("fee awards under § 1988 were never intended to produce windfalls to attorneys . . . .") (internal quotation and citation omitted).  This too counsels against making defendants here liable for fees incurred by plaintiffs in litigating against the third-party intervenors in this case.

As with several of the other categories here, plaintiffs' counsel argued below that defendant miscategorized these hours and that "101 entries" in this category had nothing to do with plaintiff-intervenors' intervention.  R. 1507, Bonnyman Decl. at 17.  Our review of the record shows that most of the time entries in this category clearly relate to plaintiff-intervenors, and thus should be disallowed.  There are, however, other entries in this category that may have been spent on compensable tasks.  *See, e.g.*, Weitzner Decl., entry 4125 ("reviewed draft TennCare Rule 1200-13-16 and proposed revision of Paragraph C(7) of Consent Decree").   Accordingly, we vacate the award of fees for these 306.2 hours and remand for further proceedings as to the 101 entries challenged by plaintiffs.

### 5.  Work conducting "policy analysis"

We next address defendants' contention that the district court's award to plaintiffs for 672.8 hours of lobbying, policy analysis, and public relations was erroneous. Defendants categorized plaintiffs' hours in this way:  172.2 hours analyzing the Governor's TennCare reform plans, 235.3 hours engaging in public relations, 38 hours corresponding and meeting with state legislators, 215.3 hours negotiating with the Governor regarding TennCare reforms, and 12 hours analyzing defendants' pharmaceutical soft limits initiative.  Defendants contend that these hours were not reasonably expended "on the litigation." Appellant Br. in 12-5532 at 54 (quoting *Webb*, 471 U.S. at 242).  We will address each category in turn.

### a.  analyzing the Governor's TennCare reform plan

The district court concluded that the 172.2 hours analyzing the Governor's reform plan were compensable because the plan would have changed TennCare in ways that would have required modifying the 2003 Consent Decree, in that it proposed reforms to the drug authorization process, limits on Medicaid eligibility, limits on copays, and limits on services for TennCare enrollees. *Grier v. Goetz*, No. 3:79-3107, slip op. at 39 (M.D. Tenn. August 13, 2009).  In our view, this work was "necessary to enforce" the 2003 Consent Decree and resulted in a court order—the 2005 Revised Consent Decree—that secured the initial success of the 2003 Consent Decree. *Delaware Valley*, 478 U.S. at 558.  Reviewing the Governor's proposal would have allowed counsel to prepare for the merits of the litigation leading up to the 2005 Revised Consent decree.  *See Little Rock Sch. Dist. v. Arkansas*, 674 F.3d 990, 995 (8th Cir. 2012) (affirming fees for research going to the merits of the litigation on the basis that "in order to argue the merits of continued state funding, [the school district] had to research and brief the State's history of performance of its desegregation obligations throughout this entire thirty-year case.").  Accordingly we affirm the award for these hours.

### b.  public relations

With respect to the 235.3 hours spent on "public relations," the district court concluded that defendants miscategorized those hours as "public relations" when there actually were no hours billed for media relations, and the hours were really devoted to communication with opposing counsel or document review relating to compliance with the 2003 Consent Decree. *Grier v.Goetz*, No. 3:79-3107, slip op. at 40 (M.D. Tenn. August 13, 2009).  But the district court's conclusion is not entirely consistent with counsel's own explanation for these hours.  While counsel asserted that none of the hours were spent on communications with the general public, counsel also added that this time was spent communicating with TennCare contractors on compliance issues.  R. 1507, Bonnyman Decl. at 8.  Additionally, he explained that the hours were spent on educational and training activities involving counsel from other health advocacy organizations, and that the training was "provided cooperatively with the State as part

of our role in implementing the Consent Decree and ensuring compliance with its provisions."  R. 1507, Bonnyman Decl. at 8.

There is nothing in counsel's explanation for these hours that leads to the conclusion drawn by the district court that all of the hours were spent communicating with opposing counsel or conducting document review.  Moreover, it is clear that counsel took on an educational role following entry of the 2003 Consent Decree, but to the extent that the 2003 decree vests any responsibilities in plaintiffs' counsel, it does not go so far as to say that counsel can act as a consultant to the state and its contractors and then get the state to pay the bill when counsel requests fees under § 1988.  If counsel's expertise on the matters in this litigation had put him in the unique position of being able to assist the state with implementation of its healthcare program, the parties could have contracted for counsel to be compensated for such educational activities.

While it is apparent that educating defendants' contractors was likely helpful for ensuring that the 2003 Consent Decree's provisions were properly executed, it is much less clear how these training events in any way helped plaintiffs to prevail in defending that decree from defendants' motion to modify.  In other words, there is no indication in the record that these events contributed to the court order approving the 2005 Revised Consent Decree.

However, there are a few entries that seem to be related to opposing defendants' modifications and enforcing the 2003 decree.  *See, e.g.*, Weitzner Decl. entry 3932 ("conferred with Office of General Counsel re pharmacy Appeals").  Those hours may still be compensable.  Thus, we vacate the award for these 235.3 hours and remand to the district court for further proceedings.

### c.  meetings with legislators and State officials

Defendants next contend that plaintiffs' 38 hours spent corresponding and meeting with state legislators should not be compensable.  The district court concluded that plaintiffs had to use those meetings to respond to "legislative requests and overtures" regarding potential modifications to the 2003 Consent Decree, and thus the

hours were compensable.  Counsel further explained that in late 2004 and early 2005, defendants told these legislators to urge plaintiffs' counsel to modify the consent decree. R. 1507, Bonnyman Decl. at 6.  Counsel claims that the hours in question were spent "respond[ing] to these overtures . . ." in an effort to "negotiate a compromise that would preserve the protections of the Consent Decree . . . ."  R. 1507, Bonnyman Decl. at 7.

A review of counsel's hours submitted to the district court confirms that counsel spent a substantial amount of time in late 2004 and early 2005 meeting with various legislators, *see, e.g.*, Weitzner Decl., entry 1155 ("meeting with Senator Henry at his request to discuss consent decree"); *id.*, entry 842 ("meeting with Congressman Cooper re. waiver and state allegations r. the consent decree"), who, at least according to counsel, were in some capacity acting as agents of the State and negotiating potential revisions to the 2003 Consent Decree.  Noticeably absent from counsel's time entries however is any indication that opposing counsel was ever present during these negotiations, or even that opposing counsel was aware of and had signed off on these alleged negotiations.  Apparently, counsel realized these negotiations presented an ethical dilemma because at several other points counsel's time entries indicate that he "reviewed ethics issues related to negitiations (sic), and correspondence," and had an "ethics discussion" with co-counsel regarding the negotiations.  R. 1442-1, Page ID # 11971, 11973.

We are troubled by the idea that plaintiffs' counsel could meet with state legislators or other agents of the state during the course of litigation, but do so without opposing counsel present.  Only hours "reasonably expended *on the litigation*," *Webb*, 471 U.S. at 242, are compensable under § 1988. *Cf.* TENN. RULES OF PROF'L. CONDUCT 4.2 (2011) ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."); cmt. 3 ("The Rule applies even though the represented person initiates or consents to the communication.").

There is no indication in the record that opposing counsel was present at or consented to any of these meetings, or that plaintiffs' counsel was authorized to talk with defendants' agents by law or court order.

In light of these considerations, we hold that § 1988 fees for negotiations or lobbying with the opposing party or a representative of the opposing party are compensable only if the record shows that opposing counsel was present or that counsel authorized the interaction. If counsel is not present, then the time was not spent "on the litigation." *Webb*, 471 U.S. at 242. Here, the record is not clear regarding whether counsel was present or consented to the negotiations. Accordingly, we vacate the award for these 38 hours and remand this issue for further proceedings in order to give counsel the opportunity to show that opposing counsel was present at these negotiations or that opposing counsel authorized the interactions.

This same fate befalls counsel's claims for 215.3 hours spent "negotiating with the Governor." Although counsel maintains that of the 101 time entries that fall into this category only nine of them were for negotiations or communication directly with the Governor, counsel also states that the other meetings involved negotiations with defense counsel or "intermediaries." Because the district court summarily affirmed these hours, we vacate and remand for further proceedings in order to determine how many of these 215.3 hours were spent negotiating with opposing counsel, as plaintiffs maintain, or alternatively were spent negotiating with intermediaries with opposing counsel present or with opposing counsel's knowledge.

#### d. analyzing soft-limits initiative

Defendants next challenge 12 hours allegedly spent analyzing defendants' pharmaceutical soft-limits initiative. The soft limits controversy came about as a result of defendants' attempt following the 2003 Consent Decree to impose a "hard" five prescription per month limit on TennCare beneficiaries. Plaintiffs advocated using a "soft" limit instead. Defendants ultimately conceded that the five prescription limit would be soft rather than hard. R. 1342, Page ID # 8963. Counsel asserts that the time spent on the soft-limits initiative was communications with defense counsel and "review

of . . . notices related to implementation of the initiative" in order to enforce defendants' commitment to institute the soft limits.  R. 1507, Bonnyman Decl. at 9-10.  Though this initiative clearly related to the 2003 Consent Decree, it is unclear from the record whether this work was in any way "necessary to enforce" the 2003 Consent Decree and secure the initial success of that decree.  *Delaware Valley*, 478 U.S. at 558.  Accordingly, we vacate the award for these 12 hours and remand to the district court for a determination under this standard.

### 6.  Twenty-percent reduction

Finally, in contesting the fee award below, Defendants requested a 43.5% reduction in the lodestar amount.  The district court ultimately settled on a 20% reduction.  Though the Supreme Court has acknowledged that "[t]here is no precise rule or formula for making these determinations," *Hensley*, 461 U.S. at 436, it also explained that in lengthy civil rights litigation, the "range of possible success is vast," and the fact that the plaintiff is a "prevailing party . . . may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved." *Hensley*, 461 U.S. at 436.  Further, "[i]t is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination . . . . Unless such an explanation is given, adequate appellate review is not feasible, and without such review, widely disparate awards may be made, and awards may be influenced (or at least, may appear to be influenced) by a judge's subjective opinion regarding particular attorneys or the importance of the case." *Perdue*, 130 S. Ct. at 1676.

There is no question in this case that Tennessee's fiscal crisis in 2003-2004 required a complete overhaul to the TennCare system, and thus a complete overhaul of the protections previously won in the 2003 Consent Decree.  The modifications won by defendants in the 2005 Revised Consent Decree clearly allowed them to reform the system in ways that at least in part addressed this fiscal crisis.  This was no small victory.

This conclusion is consistent with our review of the record, which reveals that the district court only denied a single one of defendants' 34 modification requests—the

request to add a termination clause to the 2003 Consent Decree. Of the 33 other requests, at least five were granted in whole, and the rest were granted in significant part. For example, the district court even acknowledged that of defendants' five requests dealing with the prior authorization appeals process, the court "granted most" of the requests albeit with a few limitations. *Grier v. Goetz*, No. 3:79-3107, slip op. at 49 (M.D. Tenn. August 13, 2009). The court also permitted defendants to "require prior authorization . . . as a condition of coverage for any drug or drug class so designated by the State;" implement a five prescription per month limit; implement significant benefit limits (granting five of the six requests in this category); refuse to consider grounds for challenges not previously raised in appeals for service denials; implement a screening process for claims not based on a valid factual dispute; and remedy defects in notice requirements and missed appeal deadlines. *Grier v. Goetz*, 402 F. Supp.2d 876, 900-930 (M.D. Tenn. November 15, 2005). The district court also acknowledged the clear limits on plaintiffs' success "relative to the breadth of Defendants' requests and the scope of the litigation." *Grier v. Goetz*, No. 3:79-3107, slip op. at 49 (M.D. Tenn. August 13, 2009).

Though the Supreme Court has recognized the difficulty in assessing fee applications with mathematical precision, in *Perdue*, the Court remanded in part because the district court did not explain why it granted a 75% enhancement "rather than 50% or 25% or 10%." *Perdue*, 130 S. Ct. at 1675. In addressing defendants' request in this case, the district court briefly and summarily described how defendants were largely successful in their efforts to modify the 2003 decree, but that the success was also limited by plaintiffs' efforts. Ultimately, the court pronounced that a 20% reduction was reasonable. But the court's brief characterization of the very complex 2005 Revised Consent Decree does not demonstrate why the court settled on 20%, as opposed to 43.5% or 60% or 70%. We conclude that under the long history of this case and in light of the significant change in the parties' relationship that the 2005 Revised Consent Decree wrought, this explanation was insufficient. Accordingly, we vacate the district court's 20% reduction and on remand, after recalculating the fee award, the district court

should reassess any reduction in light of these considerations, and "employ a methodology that permit[s] meaningful appellate review." *Id.* at 1676.

VI.

For the foregoing reasons, we **AFFIRM** the award for work involving review of the Governor's proposal, we **VACATE** the award for fees involving work in *John B., Ware*, and *Daniels*, and we **VACATE and REMAND** the overall percentage reduction, and the award for work involving *Rosen*, the HAT injunction, opposing plaintiff-intervenors, work categorized as public relations, negotiating with legislators, negotiating with the Governor, and analyzing the soft-limits initiative.